COLEGIO DE ABOGADOS DE PUERTO RICO, querellante, *v.* ROBERT E. SCHNEIDER y OTROS, querellados.

*Número:* O-77-431        *Resuelto:* 26 de junio de 1986

---

506

*Abrahan Díaz González, Maricarmen Ramos de Szendrey, Raúl Serrano Geyls* y *otros,* abogados del querellante Colegio de Abogados de Puerto Rico; *Robert E. Schneider* y *Héctor R. Ramos Díaz, pro se.*

EL JUEZ PRESIDENTE SEÑOR PONS NÚÑEZ emitió la opinión del Tribunal.

## I

En 1982, mediante opinión del Juez Presidente Señor Trías Monge, este Tribunal decidió, *inter alia,* que la Ley Núm. 43 de 14 de mayo de 1932, que crea el ilustre Colegio de Abogados de Puerto Rico (el Colegio); que la colegiación compulsoria de los abogados, la imposición de cuotas y el precepto de ley que obliga a los abogados a cancelar sellos y pagar

cuotas al Colegio son constitucionalmente válidos. También decidimos que el Colegio puede dedicarse a toda actividad autorizada por la Asamblea Legislativa de Puerto Rico o por este Tribunal que esté racionalmente vinculada a los propósitos expresados en la Ley Núm. 43, *supra*, o en la orden que este Tribunal emitiese en su día; que el Colegio goza de amplia libertad de expresión bajo las disposiciones del Art. II, Sec. 4 de la Constitución del Estado Libre Asociado de Puerto Rico y que la libertad de expresión del Colegio, en representación de la mayoría de sus miembros, no puede coartarse por colegiados disidentes. Decidió además este Tribunal que en razón de su libertad de expresión el Colegio puede, constitucionalmente, expresarse sobre asuntos ideológicos, pero que los colegiados que disientan sobre tales expresiones tienen derecho, bajo la Constitución de Puerto Rico, a objetar el uso de sus aportaciones, o de alguna porción de ellas, para las actividades ideológicas que desaprueben.

En consecuencia de lo anterior decidimos que debía proveerse un remedio adecuado para hacer valer el derecho de los objetores a no contribuir económicamente a las expresiones o actividades de naturaleza ideológica. A esos efectos fijó un procedimiento para que el propio Colegio estructurara un remedio apropiado. Véase *Colegio de Abogados de P.R.* v. *Schneider*, 112 D.P.R. 540 (1982).

Subsiguientemente, el 6 de mayo de 1982, emitimos una resolución para conservar nuestra jurisdicción sobre el caso a los fines de entender en cuestiones relativas a la parte de nuestra sentencia que se refiere al remedio así como para aprobar, modificar o desaprobar el remedio que el Colegio pudiera estructurar. En junio de 1982 suspendimos a los abogados Robert E. Schneider y Héctor Ricardo Ramos Díaz de la práctica de la profesión por no haber cumplido con aquella parte de nuestra sentencia que disponía un pago temporal de cuotas al Colegio hasta tanto se estructurara el remedio.

Los abogados Schneider y Ramos instaron entonces en el Tribunal de Distrito de E.U. para el Distrito de Puerto Rico (Tribunal federal), una acción sobre Sentencia Declaratoria e *Injunction* y Reclamación de Daños contra el Colegio, los Secretarios de Justicia y Hacienda de Puerto Rico y los Jueces de este Tribunal, ([1]) todo ello basado en la alegada inconstitucionalidad de la Ley Núm. 43, *supra*, de la colegiación compulsoria y la obligación de cancelar sellos y pagar cuotas al Colegio.

El 25 de junio de 1982 el Colegio de Abogados presentó una moción informativa ante este Tribunal sobre su concepción de lo que constituían actividades ideológicas y en diciembre de 1982 sometió el remedio que había estructurado y que pretendía cumplir con nuestra sentencia.

Después de la dilucidación de varios incidentes procesales y cuestiones colaterales el Tribunal federal, el 16 de junio de 1983, mediando opinión de su Juez Presidente Hon. Juan R. Torruella, sin que este Tribunal se hubiese pronunciado sobre el remedio confeccionado por el Colegio, determinó que el remedio constituía un engaño (*sham*); que las Secs. 3, 4, 10 y 11 de la Ley Núm. 43, *supra*, parte de la Sec. 6 de la Ley Núm. 99 de 27 de junio de 1956, y parte de la Sec. 38 de dicha Ley Núm. 99, *supra*, así como la Ley Núm. 115 de 6 de mayo de 1941 (4 L.P.R.A. sec. 785), según éstas regían, se interpretaban y se ponían en vigor, violentaban las disposiciones sobre libre expresión y asociación contenidas en la primera enmienda a la Constitución de E.U. y contravenían las enmiendas quinta o decimocuarta a dicha Constitución. En consecuencia de tal determinación, y hasta que el Colegio cesara de

---

([1]) Posteriormente, mediante decisión de la Corte de Apelaciones para el Primer Circuito, la acción contra los jueces de este Foro fue desestimada, aunque se les retuvo como partes nominales, en su capacidad administrativa, en cuanto a las causas de acción impugnando los sellos notariales y forenses. *In re Justices of Supreme Court of Puerto Rico*, 695 F.2d 17 (1982).

llevar a cabo tales actividades, el Tribunal federal emitió un *injunction* para prohibir que se tomaran medidas disciplinarias contra un miembro del Colegio por no pagar las cuotas; que se conculcaran los derechos de una persona a practicar la abogacía por no pagar dichas cuotas o por no pertenecer al Colegio; que se usaran fondos y facilidades públicas para la venta de sellos forenses para beneficio del Colegio, y para prohibir también que se denegara validez a alegaciones, instrumentos públicos y escrituras por razón de que en los mismos no se adhirieran o cancelaran sellos notariales o forenses. *Schneider* v. *Colegio de Abogados de Puerto Rico*, 565 F. Supp. 963 (1983). Dicho Tribunal se negó a suspender la vigencia del *injunction* decretado mientras el Colegio tramitaba una apelación, de la sentencia dictada, ante el Primer Circuito del Tribunal de Apelaciones de E.U. *Schneider* v. *Colegio de Abogados de Puerto Rico*, 572 F. Supp. 957 (1983).

Al hacer su dictamen de inconstitucionalidad el Tribunal federal esencialmente limitó sus determinaciones de hecho a aquellos que entendía constituían actividad ideológica o político-partidista y no describió ni hizo determinaciones sobre las otras actividades desplegadas por el Colegio ni la proporción de recursos dedicados a unas y otras.

Planteado el caso ante el Primer Circuito del Tribunal de Apelaciones de E.U. éste suspendió la vigencia del *injunction* y procedió subsiguientemente a revocar el dictamen del Tribunal federal. *Romany* v. *Colegio de Abogados de P.R.*, 742 F.2d 32 (1984).

Al así hacerlo el Primer Circuito indicó que este era un caso apropiado para que el Tribunal federal se abstuviera de intervenir, esto es, para que se pospusiera el ejercicio de la jurisdicción federal, hasta tanto este Tribunal provea un remedio, o antes en caso de una desusada demora. También determinó que debía proveerse, por este Tribunal si estaba en disposición de hacerlo, un remedio provisional inmediato que salvaguardara los derechos de las partes hasta tanto se

estructurara un remedio permanente y se resolvieran en definitiva los reclamos de las partes.

El 13 de noviembre de 1984 emitimos una orden que proveía un remedio provisional. En esa misma fecha se ordenó la celebración de vista para que las partes tuvieran oportunidad de presentar prueba y para presidir dicha vista se nombró al ex juez de este Tribunal, Hon. Mariano Ramírez Bages (el Comisionado).

Subsiguientemente reinstalamos en el ejercicio de la profesión a los abogados Schneider y Ramos toda vez que ellos se acogieron al remedio provisional decretado.

El 4 de enero de 1985 se celebró ante el ex juez Ramírez una conferencia con antelación a la vista. En ella el Lcdo. Héctor Márquez solicitó por sí y en representación de los querellados, Lcdos. Oreste Ramos Díaz, Jorge Romany y Jorge Souss, que se les relevara de ulterior participación en el caso. Se accedió a su petición y se continuaron los procedimientos en cuanto a los Lcdos. Robert E. Schneider y Héctor Ricardo Ramos Díaz. En el curso de la conferencia el Colegio anunció que presentaría extensa prueba documental y testifical. Los abogados Schneider y Ramos Díaz anunciaron que no presentarían prueba.

El 23 de enero de 1985 las partes suscribieron una estipulación para solicitar la modificación de la resolución de 13 de noviembre de 1984 y para cubrir además ciertos aspectos procesales. La misma fue aprobada por el Tribunal al día siguiente.

La vista evidenciaria se celebró los días 15 y 22 de enero, 4, 5 y 6 de febrero y 11, 13 y 25 de marzo de 1985. En el transcurso de la misma el Colegio presentó abundantísima prueba documental y prueba testifical. Dicha prueba no fue controvertida por los abogados. Aun cuando en la conferencia con antelación a la vista los querellados indicaron que no presentarían prueba durante el transcurso de la vista, el licenciado Schneider solicitó que se le permitiera someter el récord

del caso proseguido ante el Tribunal federal. El Comisionado accedió a la solicitud del licenciado Schneider y dicho récord fue recibido en evidencia.

Terminada la vista ante el Comisionado el 25 de marzo de 1985 éste ordenó a las partes que hicieran propuesta sobre "determinaciones de hecho luego que llegue el récord federal". En vista de que para el 30 de abril los abogados Schneider y Ramos no habían presentado el récord del caso en el Tribunal federal el Comisionado ordenó a las partes que en el término de 30 días presentaran un resumen sobre la prueba presentada en el caso. Al término de los 30 días las partes no lo habían hecho y habiendo recibido el récord del caso del Tribunal federal el 11 de junio de 1985 el Comisionado, mediante orden de 12 de junio, extendió el término por treinta días adicionales. El Colegio de Abogados solicitó y obtuvo una última prórroga y le sometió al Comisionado, el 9 de agosto, un proyecto de Resumen y Análisis de la Prueba, Determinaciones de Hecho, Conclusiones de Derecho y un Remedio. Los abogados Schneider y Ramos Díaz no sometieron propuesta original alguna de remedio y se limitaron a formular, mediante moción radicada fuera de tiempo —el 20 de septiembre de 1985— objeciones al proyecto propuesto por el Colegio y a contraproponer determinaciones de hecho y derecho, resumiendo y analizando la prueba con vista a las propuestas del Colegio.

El 13 de noviembre de 1985 el Comisionado presentó su informe.

El 18 de marzo de 1986 solicitamos de las partes que ilustraran a este Tribunal los efectos que sobre estos procedimientos pudiera tener la decisión del Tribunal Supremo de E. U. en *Chicago Teachers Union* v. *Hudson*, 89 L.Ed. 2d 232 (1986). Comparecieron el Colegio, los abogados Schneider y Ramos y expusieron sus posiciones.

Proveeremos el remedio que las circunstancias de hecho y derecho configuran. Primero, sin embargo, complementamos, a la luz de la prueba en el récord de este caso, las determina-

ciones de hecho del Tribunal federal así como las contenidas en nuestro *Colegio de Abogados de P.R.* v. *Schneider*, supra. Creemos que ello es necesario toda vez que el Tribunal federal en su análisis se limitó a extraer de la prueba presentada ante él aquellos ejemplos que a su juicio evidenciaban actividades ideológicas o político-partidistas. No creyó necesario describir el carácter multifacético del Colegio, ni sus otras actividades ni la proporción de recursos que se dedican a ellas. (²) Sería, sin embargo, prolijo que enumeremos todas esas actividades. La prueba sobre ellas que obra en el récord, y que resumimos en el apéndice que unimos a esta opinión, es abundantísima por lo que nos limitamos a formular algunas conclusiones que en general recogen la prueba presentada, incluyendo las actividades que se resumen en el apéndice, y que complementan las conclusiones ya formuladas en el largo peregrinaje de este caso. Veamos.

## II

### *Conclusiones complementarias sobre hechos*

El Colegio de Abogados ha cumplido adecuadamente las obligaciones que le impuso la ley que lo creó. Ha contribuido al mejoramiento de la administración de la justicia; ha formulado informes; ha contestado consultas reclamadas por el Gobierno; ha defendido con celo los derechos e inmunidades de los abogados procurando que éstos gocen ante los tribunales de la libertad necesaria para el buen desempeño de su profesión; ha promovido relaciones fraternales entre sus miembros, y ha velado por el sostenimiento de una saludable moral

---

(²) Sobre este particular el Primer Circuito del Tribunal de Apelaciones de E. U. también se ha expresado. Señaló:

"En el caso de autos, mientras la Corte de Distrito examinó la extensión de las actividades ideológicas del Colegio, no describió las otras labores del Colegio o la proporción de los recursos dedicados a ellas." (Traducción nuestra.) *Romany* v. *Colegio de Abogados de P.R.*, 742 F.2d 32, 41 esc. 9 (1984).

profesional entre los colegiados. También ha contribuido a enriquecer la vida intelectual de los abogados y ha fortalecido la aspiración colectiva a una sociedad democrática al amparo de la ley.

El Colegio es una entidad democrática. Su Presidente, su Junta de Gobierno y las directivas de las Delegaciones son electos en asambleas que garantizan a todos los colegiados la participación, libre expresión y el derecho a presentar y debatir resoluciones. En la asamblea anual se aprueba el presupuesto de la institución. La vida institucional propicia la participación abierta y la tolerancia.

La institución ha alentado la libertad de expresión entre sus colegiados y entre los ciudadanos. Mediante el pago de un canon preestablecido permite el uso de algunos de sus recursos físicos a toda persona, natural o jurídica, que interese ejercer la libertad de expresión garantizada por las disposiciones constitucionales aplicables. Por reglamento, exime de dicho canon a determinadas instituciones íntimamente relacionadas con las funciones que le han sido encomendadas al Colegio, principalmente compuestas por abogados o estudiantes de derecho. Como foro libre para la profesión y para la comunidad el Colegio ha propiciado exhibiciones artísticas, artesanales y, en síntesis, ha contribuido a mejorar la calidad de la vida. La institución juega un papel importante en el desarrollo vital del país.

El Colegio de Abogados cuenta con comisiones permanentes y especiales cuyo número fluctúa alrededor de treinta y cinco (35). Entre otras podemos señalar las de: Ética; Legislación; Educación Legal; Para el Estudio del Desarrollo Constitucional; Evaluación de Nombramientos Judiciales; Evaluación de Nombramientos de Fiscales; Derecho de Familia; Derecho Penal; Derecho Laboral; Proceso Electoral; Seguros; Derecho Registral y Notarial; Libertades de Expresión, de Información y Prensa; Derechos del Consumidor; Asuntos de la Mujer; Reglamento del Colegio; Actos Públicos

y Culturales; Deportes; Derecho Internacional y Relaciones con Organizaciones Profesionales de Carácter Internacional; Amenaza de las Armas Nucleares; Becas; Recursos Naturales y Calidad Ambiental; Derecho y Computadores; Relaciones entre Jueces, Fiscales, Registradores y Abogados.

La prueba demostró, más allá de toda duda, que estas comisiones desempeñan una labor profesional efectiva y fructífera para la institución y la comunidad. Las Comisiones de Ética, Legislación y Educación Legal están integradas por abogados dedicados y distinguidos que han descargado su labor profesionalmente. El testimonio del Presidente del Colegio y un examen de la evidencia documental demuestran que, en general, la composición y el descargo de la labor por las otras comisiones también ha sido adecuado.

La labor que realiza la Comisión de Ética constituye un esfuerzo efectivo para garantizar la pulcritud en el cumplimiento de las obligaciones profesionales por parte de todos los abogados. La Comisión de Educación Legal y el Instituto de Educación Práctica, a través del cual realiza su obra, han contribuido a mejorar la calidad de la enseñanza del derecho al hacer posible el inicio de un programa de maestría en la Universidad Católica. Mantiene un programa de cursos de reválida en el que participan un gran número de profesores de todas las universidades de Puerto Rico y celebra, además, muchísimos seminarios, foros y actividades similares. La Comisión de Legislación le presta servicios profesionales al Colegio, a la Legislatura y al Gobierno. En muchas ocasiones el señor Gobernador ha solicitado la colaboración del Presidente del Colegio, en lo que respecta al nombramiento de jueces y fiscales. La Legislatura solicita sistemáticamente la opinión del Colegio en materias que afectan la administración de la justicia, los derechos civiles o intereses fundamentales de los ciudadanos.

El Colegio además ha colaborado con la Junta Examinadora de Reválida y con el Tribunal Supremo en lo que res-

pecta a las conferencias judiciales y al estado de la enseñanza del derecho. Con frecuencia el Tribunal Supremo ha consultado al Colegio en lo que respecta a la aprobación de algunos reglamentos que se refieren a la práctica de la profesión. Muchas agencias del Gobierno consultan sobre cuestiones de derecho vitales a los intereses sociales. Esto es, el Colegio ha sido un colaborador efectivo de las distintas ramas del Gobierno y un servidor de los colegiados y de la comunidad.

Las publicaciones del Colegio constituyen otra aportación al fortalecimiento de la vida profesional. La institución ofrece un servicio mediante el cual publica y distribuye entre su matrícula las opiniones emitidas por el Tribunal Supremo libre de costo adicional. Distribuye, además, una publicación titulada "Notificaciones del Director Ejecutivo", que contiene noticias de interés para todos los abogados. Con la Oficina de Administración de los Tribunales colabora en la publicación y distribución de una revista titulada "Forum", que se distribuye gratis entre todos los jueces y abogados, y que tiene el objetivo de mejorar la calidad de la administración de la justicia y elevar el nivel de la práctica profesional. La Revista del Colegio de Abogados de Puerto Rico fue fundada el 1ro de enero de 1914. Ha sido un foro libre donde los autores, naturalmente, asumen la responsabilidad de sus escritos. Así se ha hecho constar expresamente a partir de 1984. La revista ha recibido las colaboraciones de los abogados más distinguidos de Puerto Rico y tiene circulación en el exterior. El Colegio también publica y distribuye también un Programa para la Asamblea Anual que contiene, entre otras cosas, un estado de situación certificado y el presupuesto para el próximo año. Los colegiados reciben libre de costo adicional todas esas publicaciones. En adición a las mencionadas, el Colegio auspicia la publicación de diversas y numerosas obras, libros, panfletos e informes que aportan significativamente al mejoramiento de la vida profesional.

El Colegio presta muchos servicios excepcionales a la comunidad. Basta señalar su participación efectiva en la Corporación de Servicios Legales, en la Sociedad para la Asistencia Legal y en la Oficina Legal de Santurce. Su programa de Servicios Legales Voluntarios (Pro Bono), cuenta con la colaboración de más de 800 abogados que dedican sus esfuerzos a la defensa de personas indigentes. La aportación social extraordinaria de Pro Bono al país en 1984 le hizo merecedor del "Harrison Tweed Award" que en 1984 le otorgó la American Bar Association.

Los ingresos del Colegio provienen de las cuotas de colegiados (montantes a $100 anuales por cada uno), la venta de sellos forenses y notariales, el sobrante del importe de las fianzas notariales, ingresos por concepto de suscripciones de revistas, alquiler de locales, intereses, venta de libros y otros ingresos misceláneos. Durante 1984 los ingresos de la institución ascendieron a $1,318,440 y los gastos a $1,361,105, lo cual reflejó un déficit de $42,665. El anteproyecto de presupuesto para 1985 estimó los ingresos en $1,247,800 y los egresos en $1,288,785 para un déficit estimado de $40,985.

La institución ha hecho posible un seguro en caso de muerte de cada colegiado que asciende $15,000, pero se reduce a $7,500 cuando el abogado muere luego de cumplir 70 años. En caso de muerte por accidente, la compensación asciende a $30,000 para los menores de 70 años y $15,000 para los mayores.

Los estudios demuestran que el costo de la prima de seguro por colegiado asciende a $73.76 y que el costo de las opiniones que se distribuyen entre los colegiados ascendió a $22.45 por colegiado en 1984.

El Colegio lleva una contabilidad rigurosa de sus ingresos y desembolsos. Tiene un sistema competente y responsable de auditoría interna y externa. Ha diseñado un sistema en virtud del cual es posible determinar los costos directos e indirectos de cualquier actividad de manera que puede precisarse con

exactitud qué aportación correspondería a cada colegiado en cualquier actividad determinada.

Desde que se estableció el procedimiento que permite a sus colegiados objetar actividades que puedan entender son de carácter ideológico, sólo 150 de los 6,704 colegiados (2.24%) han ejercitado la opción de pedir que 50% de su cuota se deposite en la cuenta de plica. Resulta significativo que hasta que terminaron las vistas ante el Comisionado nadie había objetado ninguna actividad específica celebrada por la institución desde la fecha en que se estableció el sistema de cuenta de plica en el remedio provisional.

En resumen, el estudio de la prueba revela la multidimensionalidad de las actividades del Colegio y en casi su totalidad su íntima relación con la profesión y fines y propósitos del Colegio. No obstante, como hemos visto ya en *Colegio de Abogados de P.R.* v. *Schneider*, supra, *Schneider* v. *Colegio de Abogados*, supra, y *Romany* v. *Colegio de Abogados de P.R.*, supra, el Colegio ha desplegado otras actividades que han sido impugnadas por algunos colegiados. En *Schneider*, supra, el Tribunal federal enumeró las actividades que a su juicio eran ideológicas.

Después de examinar cuidadosamente toda la evidencia presentada ante el Comisionado, así como toda la prueba desfilada en el Tribunal federal, concluimos que las actividades denominadas ideológicas constituyen una exigua proporción de todos los trabajos realizados por el Colegio.

### III

En *Colegio de Abogados de P.R.* v. *Schneider*, supra, pág. 549, ya hicimos un examen de los intereses apremiantes del Estado en esta situación en contraposición con los derechos constitucionales individuales de libertad de expresión y asociación, no en su modalidad clásica de la prohibición de éstos, sino en su modalidad de compulsoriedad de asociarse e identificación con la expresión de la asociación.

Señalamos allí:

> Los intereses públicos en la creación de una sociedad vigo-
> rosamente pluralista, en el mejoramiento de la abogacía y
> en la buena marcha del sistema judicial pesan decididamente
> más que las inconveniencias personales que pueda acarrear
> en ciertos casos la colegiación obligatoria. El derecho a la
> no asociación derivable del derecho contrario consagrado en
> la Constitución del Estado Libre Asociado, Art. II, Sec. 6,
> cede ante los intereses señalados, de naturaleza claramente
> imperiosa bajo la constitución puertorriqueña.

■ La erosión de los derechos constitucionales de los letrados disidentes es pequeña y tolerable y no exige el sacrificio de los intereses apremiantes del Estado ni un menoscabo mayor de los derechos constitucionales del Colegio de Abogados en vista: (1) del balance que ya resolvimos arrojan los intereses que compiten en este asunto; (2) de que en los procedimientos habidos ante el Comisionado los abogados comparecientes no ofrecieron prueba de que el contenido obligacional de la colegiación compulsoria vaya más allá de una aportación económica; (3) de que, como hemos concluido, las actividades denominadas ideológicas constituyen una parte exigua de todos los trabajos realizados por el Colegio, y (4) de que la ley le provee a la institución una estructura democrática.

■ No obstante que esa erosión sea pequeña y tolerable también decidimos en *Colegio de Abogados de P.R.* v. *Schneider*, supra, págs. 554–555, que aquellos "letrados que disientan sobre tales expresiones, aunque no los que se opongan a la realización por el Colegio de los fines que la ley expresa o que este Tribunal señale, gozan por otra parte, bajo la Constitución de Puerto Rico del derecho a objetar el uso de sus aportaciones o de porción de ellas para las actividades ideológicas que desaprueben".

Para atender ese derecho a objetar que le hemos reconocido a los abogados disidentes es que hemos de proveer un re-

medio. Antes de hacerlo, sin embargo, entendemos que sucintamente debemos referirnos a dos casos resueltos por el Tribunal Supremo de E. U. que por ser más recientes no fueron considerados en *Colegio de Abogados de P.R.* v. *Schneider*, supra. Éstos proveen algunas guías generales adicionales para diseñar un remedio.

◾ Nos referimos a ellos, al igual que en adelante a otros casos resueltos por el Tribunal Supremo de E. U., con fines comparativos y de orientación ya que hemos concluido, dentro del marco de esta controversia, que "la cláusula sobre libertad de expresión del Art. II, Sec. 4 de la Constitución de Puerto Rico no tiene un sentido más estrecho que el impartido a la Primera Enmienda en este contexto [uniones con cláusulas de taller agencial] por el Tribunal Supremo de Estados Unidos". (Corchetes nuestros.) *Colegio de Abogados de P.R.* v. *Schneider*, supra, pág. 554.

◾ En *Chicago Teachers Union* v. *Hudson*, supra, dicho tribunal reiteró que la finalidad del remedio es diseñar un mecanismo que impida que una institución use las cuotas de quienes objetan el subsidio de actividades ideológicas, sin restringir indebidamente la habilidad de la institución concernida para requerir que se contribuya al costo del cumplimiento de los propósitos y fines que se le exigen en atención a los intereses apremiantes que se persiguen.

◾ Anteriormente el Tribunal Supremo de E. U. en *Ellis* v. *Railway Clerks*, 466 U.S. 435 (1984), había rechazado, por inadecuado, el mecanismo de simple devolución de cuotas a los objetores ya que resultaba en un beneficio temporero o un préstamo involuntario para el sindicato concernido. Propuso entonces como alternativas descuentos anticipados en las cuotas o depósitos en cuentas de plica. Procedió luego a examinar algunas actividades particulares del sindicato para determi-

nar su carácter ideológico; *e.g.* la convención, los litigios, las publicaciones, las actividades sociales, etc.

*Chicago Teachers Union* v. *Hudson,* supra, págs. 244–245, complementó aquellos pronunciamientos y elaboró, con mayor rigurosidad, las medidas procesales particulares que exigen los derechos en pugna. Fundamentó tales exigencias, dentro del contexto de la relación sindical, de la siguiente forma:

> Salvaguardas procesales para alcanzar este objetivo son necesarias por dos razones. Primero, aunque el interés gubernamental en la paz laboral es suficientemente fuerte como para mantener un "taller agencial" a pesar de su limitada transgresión sobre los derechos constitucionales de los empleados no unionados, el hecho de que esos derechos están protegidos por la Primera Enmienda requiere que el procedimiento sea cuidadosamente ajustado para minimizar la transgresión. Segundo, el empleado no unionado —el individuo cuyos derechos de Primera Enmienda están siendo afectados— debe tener una oportunidad justa para identificar el impacto de la acción gubernamental sobre sus intereses y sostener una reclamación meritoria de Primera Enmienda. (Traducción nuestra y escolios omitidos.)

■ Las principales medidas procesales ratificadas y elaboradas en estos casos pueden resumirse en las siguientes: (1) los objetores potenciales deben recibir la información adecuada que justifique la cuota impuesta cuando se ha escogido el método de reducción de cuota, o la proporción depositada cuando se ha escogido el método de cuenta de plica; (2) el proceso de adjudicación debe ser razonablemente expedito y ante un foro imparcial de manera que sea justo y objetivo; (3) el objetor tan sólo tiene la sencilla obligación de dejar saber su objeción ya que ésta no se presume, y (4) la asociación tiene el peso de la prueba para establecer la proporción de la cuota que se utilice en la actividad objetada.

■ Con miras a todos los hechos determinados, a lo que decidimos en *Colegio de Abogados de P.R.* v. *Schneider,* supra,

interpretando los derechos de las partes a la luz de la Constitución del Estado Libre Asociado, a la orientación que nos ofrecen los casos de *Lathrop* v. *Donohue*, 367 U.S. 820 (1961); *Romany* v. *Colegio de Abogados de P.R.*, supra; *Machinists* v. *Street*, 367 U.S. 740 (1961); *Railway Clerks* v. *Allen*, 373 U.S. 113 (1963); *Abood* v. *Detroit Board of Education*, 431 U.S. 209 (1977); *Ellis* v. *Railway Clerks*, supra, y *Chicago Teachers Union* v. *Hudson*, supra, y en el ejercicio de nuestra responsabilidad y poder inherente, configuramos el remedio para aquellos que objeten el uso de sus aportaciones y de los recursos del Colegio para actividades de naturaleza ajena, no germana a los fines y propósitos de éste. Aunque las actividades que dan lugar a estos procedimientos son aquellas que han sido hasta ahora denominadas "ideológicas", creemos más apropiado referirnos a todas colectivamente como "actividades objetables".

■ El propósito del remedio que configuramos es proveer a dichos colegiados un instrumento para hacer valer efectivamente sus derechos e impedir que sus aportaciones económicas se utilicen para sufragar actividades objetables y subsidiar las mismas mediante el uso de las facilidades y recursos del Colegio.

## IV

### *El remedio*

#### A. *Definiciones—"Actividades objetables"*

■ Se entenderá por "actividades objetables" aquellas que lícitamente, en el ejercicio de sus derechos constitucionales, y dentro del contexto histórico, social y político que le ha dado vida puede desplegar el Colegio de Abogados de Puerto Rico, tales como las actividades ideológicas, pero en relación con las cuales cualquier colegiado, amparándose en sus derechos constitucionales, puede válidamente objetar a

que se utilicen sus aportaciones al Colegio ya sea subvencionándolas monetariamente o proveyéndoles el uso de sus facilidades y recursos. No serán actividades objetables las que estén comprendidas en las funciones y propósitos del Colegio y sean germanas a ellas. Las funciones y propósitos del Colegio son las de:

1. Adoptar, con la aprobación del Tribunal Supremo de Puerto Rico, los Cánones de Ética profesional que regirán la conducta de los abogados.

2. Recibir e investigar las quejas que se formulen respecto a la conducta de sus miembros en el ejercicio de la profesión.

3. Instituir procedimientos de desaforo ante el Tribunal Supremo de Puerto Rico.

4. Sostener una saludable y estricta moral profesional entre los abogados.

5. Proteger a sus miembros en el ejercicio de la profesión.

6. Crear montepíos, sistemas de seguros y fondos especiales para socorrer a sus miembros o a sus herederos.

7. Defender los derechos e inmunidades de los abogados.

8. Procurar que los abogados gocen ante los tribunales de la libertad necesaria para el buen desempeño de su profesión.

9. Promover relaciones fraternales entre sus miembros.

10. Elevar los estándares educativos, culturales y éticos de los abogados para así mejorar la calidad de los servicios legales que se ofrecen al pueblo.

11. Establecer programas de servicio a la comunidad y a la profesión de abogado y, entre ellos, programas de asistencia legal para indigentes y de ayuda social para cuyo propósito tendrá facultad para promover la creación de instituciones que lo ayuden en la consecución de sus fines, tales como la Fundación del Colegio de Abogados.

12. Cooperar al mejoramiento de la administración de la justicia.

13. Evaluar los informes y consultas que el Gobierno le reclame.

14. Crear una corporación de seguro de títulos de propiedad inmueble.

15. Ejercitar otras facultades asignadas por ley o por el Tribunal Supremo de Puerto Rico y aquellas facultades incidentales que fueran necesarias o convenientes a los fines de su creación y que no estén en desacuerdo con los propósitos y la ley que crea el Colegio.

■ Las actividades objetables de terceros que utilicen las facilidades del Colegio no estarán sujetas a este remedio si las mismas no se sufragan con fondos del Colegio y generan ingresos para el Colegio que cubren sus propios costos o gastos. Si dicha actividad tan sólo generara ingresos para el Colegio de Abogados que cubran parcialmente los costos o gastos incurridos por éste, la diferencia o el balance se entenderá que corresponde al subsidio que a la misma aportó el Colegio y en cuanto a dicho balance quedará sujeto al remedio.

B. *Junta Revisora de las Actividades del Colegio de Abogados*

■ 1. Se crea por la presente la Junta Revisora de las Actividades del Colegio de Abogados como organismo autónomo.

2. La Junta Revisora estará compuesta por tres miembros quienes serán nombrados por el Tribunal Supremo de Puerto Rico. El término de cada miembro vencerá a los dos años de haber sido efectivo el nombramiento que se haga mediante resolución de este Tribunal, sin perjuicio de que sea extendido por un término adicional consecutivo. Como excepción a la norma anteriormente expuesta, los primeros tres miembros de la Junta Revisora serán nombrados por un término de uno, dos y tres años respectivamente. El Tribunal podrá, además, en el ejercicio de sus facultades nombrar dos miembros suplentes para el caso de que algunos miembros en propiedad no puedan participar en algún asunto en particular.

3. Los miembros de la Junta Revisora serán escogidos entre ex jueces de este Foro o del Tribunal de Primera Instancia.

4. De acuerdo con las necesidades y la carga de trabajo de la referida Junta, a petición de ésta, el número de sus componentes podrá ser aumentado por resolución de este Tribunal.

5. La Junta Revisora de las Actividades del Colegio de Abogados, siguiendo los criterios y garantías procesales expuestas en la jurisprudencia de este Tribunal y en este remedio, deberá examinar las actividades que realiza el Colegio de Abogados que hayan sido objetadas a fin de determinar si éstas son de carácter objetable. Deberá, además, computar la cantidad de la cuota a devolver que en su caso proceda a favor de los colegiados objetores.

6. La Junta Revisora aprobará un reglamento sobre los procedimientos ante su consideración donde proveerá, entre otras cosas: una vista administrativa rápida con notificación adecuada; un procedimiento sencillo y justo; términos precisos y razonables; oportunidad a las partes de presentar prueba a su favor y confrontar la prueba contraria, y que se hagan determinaciones de hecho y de derecho.

7. El reglamento se enmendará por decisión de la Junta Revisora o por decisión de este Tribunal. El Colegio de Abogados dará a conocer el reglamento y sus enmiendas a todos sus miembros.

8. El Colegio de Abogados deberá proveer y poner a disposición de esta Junta Revisora las facilidades físicas y materiales necesarios para su adecuado funcionamiento.

9. De las investigaciones, de los procedimientos ante la Junta Revisora, de sus resoluciones y órdenes se mantendrá informada a la matrícula del Colegio de Abogados, a través de sus canales de comunicación, de forma sucinta y sencilla.

C. *Procedimiento*

■ 1. *Notificación del derecho a objetar*

a. Al pagar su cuota anual al Colegio de Abogados, o en cualquier fecha posterior durante el año, cualquier cole-

giado tendrá derecho a notificar por escrito al Director Ejecutivo del Colegio que interesa hacer valer su derecho a objetar en forma genérica las actividades del Colegio que sean de carácter objetable. Este derecho será efectivo desde la fecha de la notificación y en relación con actividades posteriores a la misma.

b. La notificación se hará por escrito al Director Ejecutivo personalmente o por correo y en todo caso con acuse de recibo. No será necesario que el colegiado señale ninguna actividad específica. La ausencia de notificación oportuna por el colegiado se entenderá como autorización al Colegio para utilizar sus aportaciones conforme al presupuesto general de la institución.

c. Tan pronto el Director Ejecutivo reciba la notificación antes señalada, tomará una suma equivalente al quince por ciento (15%) de la cuota del colegiado objetante y la depositará en una cuenta de plica, separada de las otras cuentas del Colegio, en la cual se consignará el nombre de cada colegiado objetante. Entendiéndose que si la objeción genérica de las actividades se presenta con posterioridad a la fecha de vencimiento del pago de la cuota, la cantidad a depositarse en plica se computará sobre el balance de la cuota anual que resulte al prorratearse la misma por el término anual. La cuenta se ajustará a las tasas de interés y los términos que prevalezcan en el mercado. La Junta Revisora tendrá el deber y la facultad de variar razonablemente el monto de la proporción de la cuota que se depositará en plica de acuerdo a la experiencia acumulada.

d. Todo colegiado podrá objetar cualquier actividad determinada, sin haber notificado con anterioridad una objeción general, en cuyo caso, el remedio tan sólo le beneficiará en cuanto a dicha actividad en particular, de prevalecer en su reclamo.

2. *Objeciones a actividades objetables*

a. La objeción a determinada actividad del Colegio, por considerarse de carácter objetable, deberá hacerse ante la Junta Revisora de las Actividades del Colegio de Abogados dentro del término razonable que se disponga en el reglamento.

b. La notificación y adjudicación de las objeciones a las actividades del Colegio se regirán por este remedio y por el reglamento.

3. *Adjudicación de objeciones sometidas por los colegiados*

a. La Junta Revisora adjudicará prontamente las objeciones presentadas por los colegiados de conformidad con las disposiciones del reglamento. Notificará su resolución al objetante y al Colegio de Abogados.

b. El costo de cada actividad objetable se determinará sumando todos los gastos directos e indirectos incurridos por el Colegio en la misma. La porción de la cuota a ser devuelta al colegiado objetante será equivalente a la proporción entre el costo de la actividad objetable y la totalidad del ingreso que por concepto de cuotas reciba el Colegio en el año en que se dé la actividad. El Colegio de Abogados tiene el peso de la prueba para probar el costo y la proporción de la cuota que se utilizó en la celebración de la referida actividad.

c. La adjudicación de una actividad como de carácter objetable beneficiará a todo colegiado que haya presentado una objeción general y a aquel que la haya objetado particularmente sujeto a lo dispuesto anteriormente en los párrafos 1(a) y 1(d).

d. El objetante y el Colegio de Abogados podrán, dentro del término de treinta días a partir de haber sido notificados, solicitar del Tribunal Supremo la revisión de la resolución final de la Junta Revisora.

e. Si la Junta Revisora, o el Tribunal Supremo en revisión, determinara finalmente que ciertas actividades del Co-

legio en determinado año son de carácter objetable, el Director Ejecutivo del Colegio hará la liquidación anual de la cuenta de plica de conformidad con la resolución y orden, o resoluciones y órdenes, que emita la Junta Revisora o el Tribunal; procederá a devolver la cantidad de dinero pertinente a cada colegiado objetante.

f. No podrá hacerse la liquidación anual de existir alguna objeción pendiente de resolución para ese año, a menos que la Junta Revisora ordene la liquidación parcial, garantizando que se mantengan en dicha cuenta los fondos suficientes para satisfacer cualquier objeción pendiente.

g. Una vez hecha la liquidación anual de la cuenta de plica, el Director Ejecutivo del Colegio remitirá el sobrante, si alguno, a los fondos generales del Colegio.

D. *Sellos notariales y forenses*

1. El producto de la venta de sellos notariales y forenses no podrá utilizarse para actividades objetables.

2. El producto de la venta de los sellos notariales y forenses se utilizará para pagar los gastos del seguro de los colegiados, la ayuda legal a los indigentes, la orientación legal a la comunidad, para recibir e investigar las quejas que se formulen respecto a la conducta de los colegiados en el ejercicio de la profesión, la publicación de opiniones de los tribunales y para cualquier otro fin comprendido en las funciones y propósitos del Colegio de Abogados.

E. *Otros remedios*

Todos los principios y procedimientos establecidos en este remedio serán aplicables a las actividades que señalen los colegiados objetantes y que a juicio de la Junta Revisora resulten ser de carácter objetable. Los abogados Schneider y Ramos Díaz y todos aquellos que se han acogido al remedio provisional decretado por este Tribunal, podrán hacer una relación de las actividades que entiendan fueron de carácter

objetable desde la fecha en que cada uno de ellos presentó su querella y notificar dicha relación a la Junta Revisora para que ésta tome las medidas pertinentes.

Nada de lo aquí expresado debe entenderse como impedimento para que este Tribunal *sua sponte*, a petición de parte o de la Junta Revisora, considerando la experiencia, el desarrollo y la efectividad del remedio permanente aquí diseñado para la protección de los derechos de los colegiados objetores de las actividades objetables, provea otros remedios y tome las providencias que estime menester. Para ese fin, con el propósito de supervisar y reglar la profesión de abogado y en el ejercicio de nuestro poder inherente conservamos y retenemos jurisdicción sobre este asunto.

*Se dictará sentencia de conformidad.*

## APÉNDICE

### RESUMEN DE LA PRUEBA

Se resume en este apéndice la evidencia testifical y documental recibida en cuanto a las actividades que despliega el Colegio de Abogados en los diversos trámites acontecidos en el curso de los procedimientos ante este Foro, ante el Comisionado y ante la Corte de Distrito de E. U. para el Distrito de Puerto Rico en *Schneider* v. *Colegio de Abogados de P.R.*, supra, y demás casos consolidados con este.

El Comisionado recibió el testimonio del Lic. Abrahan Díaz González, Presidente del Colegio de Abogados y del Lic. Antonio Bennazar Vicéns, Director Ejecutivo del Colegio, quienes declararon extensamente en torno al funcionamiento del Colegio y sus actividades. Declararon además los Lcdos. Manlio Arraiza Donate y José A. Virella Santana sobre el trabajo desplegado por la Comisión de Ética. El Lic. Salvador Acevedo Colón y la Lic. Georgina Candal de Segurola testificaron sobre las actividades de la Comisión de Educación Legal

y Mejoramiento Profesional y la Comisión de Legislación que respectivamente presidían. También declaró el Sr. Juan Espiet González como Auditor Externo de la institución sobre el sistema y las prácticas de contabilidad que utiliza el Colegio. La prueba testifical no fue controvertida.

Finaliza este apéndice con una descripción de los *exhibits* presentados y recibidos.

## I. *Estructura institucional*

La Asamblea General de los colegiados, que se celebra anualmente y a la cual pueden asistir todos los colegiados, es la autoridad máxima en la estructura del Colegio de Abogados, 4 L.P.R.A. secs. 776–777; Art. 24, Reglamento del Colegio de Abogados; T.E., pág. 15. Tiene la facultad exclusiva de promulgar y enmendar el Reglamento del Colegio y de aprobar el presupuesto que le somete la Junta de Gobierno todos los años. T.E., pág. 15.

Cada dos años los colegiados escogen en la Asamblea General, por voto directo, al Presidente del Colegio y en ella pueden votar por dos delegados por acumulación. De esta forma se eligen cuatro de los delegados que pertenecerán a la Junta de Gobierno. 4 L.P.R.A. sec. 777; T.E., págs. 63–65. La Asamblea también considera aquellas resoluciones que se han sometido por conducto del Director Ejecutivo. T.E., pág. 16.

En adición a sus funciones administrativas, el Presidente es el portavoz de las determinaciones, resoluciones y acuerdos que toma la Junta de Gobierno del Colegio de Abogados. Art. 37, Reglamento del Colegio de Abogados. (*Schneider, exhibit* 4, pág. 78.) Como tal es responsable de divulgar públicamente su contenido.

En el ámbito local, el Presidente en ocasiones realiza conferencias de prensa para dar a conocer a la comunidad puertorriqueña los acuerdos alcanzados por la institución en asuntos de diversa índole. (*Schneider, exhibits* 40, 96–107; T.E., págs. 9–11, 78, 99–102, 124–125. Véanse además los *exhibits*

148 y 154.) Acude además a programas de radio y televisión con igual misión. Es invitado especial en actos y conmemoraciones relacionadas con la administración de la justicia y el desempeño de la profesión togada.([3]) Utiliza los canales de comunicación oficial del Gobierno para dejar saber el sentir del Colegio de Abogados y sus comisiones sobre diversas controversias. Así, por encomienda de ley —4 L.P.R.A. sec. 772— acude ante los foros ejecutivos y legislativos en ánimo de aportar, criticar y orientar sobre posibles soluciones o controversias, generalmente en torno a legislación pendiente y a nombramientos de funcionarios públicos relacionados con la administración de la justicia. T.E., págs. 145–149; Art. 33, Reglamento del Colegio de Abogados. (*Schneider, exhibit* 15; T.E., págs. 79–81, 118–119, 146, 152.)

En el ámbito externo ha acudido ante el Congreso de Estados Unidos y varias de sus comisiones en distintas ocasiones. (*Schneider*, T.E., pág. 78.) Se ha presentado ante la Organización de las Naciones Unidas y algunos de sus negociados o dependencias, *e.g.* Comité de Descolonización de las Naciones Unidas. Estas presentaciones las ha realizado por mandato de los órganos que rigen los destinos del Colegio: su Asamblea General y su Junta de Gobierno. 4 L.P.R.A. sec. 776; *exhibit* 36; T.E., págs. 278–280, 419–421. (*Schneider*, T.E., págs. 82, 122–123.) Véanse: *Informe del Colegio de Abogados de Puerto Rico al Comité de Descolonización de las Naciones Unidas*, 35 Rev. C. Abo. P.R. 329–356 (1974) ; *Ponencia del Colegio de Abogados de Puerto Rico ante el Comité de Descolonización de las Naciones Unidas*, 39 Rev. C. Abo. P.R.

---

([3])Palabras en ocasión de la juramentación del Juez Jaime Pieras en la Corte de Distrito de Estados Unidos en Puerto Rico (*Schneider, exhibit* 108) ; palabras en ocasión de la juramentación de la Secretaria General del Tribunal Supremo, Lcda. Lady Alfonso de Cumpiano, 111 D.P.R. XIII, XV–XVII (1980) ; sesión fúnebre en memoria del honorable Don Armindo Cadilla Ginorio, Juez Asociado del Tribunal Supremo, 103 D.P.R. IX, XIV (1975) ; ceremonia de despedida del Hon. Mariano H. Ramírez Bages, 101 D.P.R. XX (1973).

157–176 (1978). (*Schneider, exhibits* 6a, pág. 21; 6f, pág. 23; 237–239.) También se ha presentado en las Embajadas Latinoamericanas a las Naciones Unidas, etc.

El Colegio de Abogados ha sido representado a través de su Presidente o de delegaciones particulares en otros foros o cuerpos institucionales de Estados Unidos e internacionales cuando ha sido sede de encuentros de intercambio con abogados de otros países. Pennsylvania Bar Association (*Schneider, exhibit* 6c, pág. 20) ; Delegación de Abogados de Islas Vírgenes (*Schneider, exhibit* 6c, pág. 46) ; Federación Interamericana de Abogados (*Schneider, exhibit* 6d, pág. 24) ; American Bar Association (*Schneider, exhibit* 6d, pág. 26). Véase el Art. 35 del Reglamento del Colegio de Abogados.

El Presidente del Colegio de Abogados se desempeña además como miembro de los órganos directivos de otras instituciones cuyos propósitos son proveer representación, asistencia y orientación legal a los indigentes en Puerto Rico tales como la Corporación de Servicios Legales de Puerto Rico y el Instituto de Derechos Civiles de Puerto Rico. (*Schneider, exhibit* 235, págs. 213–215; T.E., pág. 104.)

La Junta de Gobierno es el cuerpo rector del Colegio, pero funciona subordinada a la autoridad de la Asamblea General. 4 L.P.R.A. sec. 776; Art. 33, Reglamento del Colegio de Abogados. Está compuesta por el Presidente del Colegio, el Presidente saliente, quien no tiene derecho a voto, y treinta (30) delegados. 4 L.P.R.A. sec. 777. Los veintiséis (26) delegados que no son electos por la Asamblea General son escogidos por las trece (13) delegaciones regionales en que se divide Puerto Rico. 4 L.P.R.A. sec. 777; T.E., págs. 16–17. La Junta de Gobierno elige a su vez a la Junta Directiva la cual tiene poder para tomar decisiones en los intervalos en que la Junta de Gobierno no está reunida. T.E., pág. 17. En reuniones, generalmente mensuales, la Junta de Gobierno analiza, estudia e interviene en distintos asuntos institucionales y de interés general que son traídos a su atención. En estas reu-

niones todos los colegiados tienen derecho a voz pero no a voto. (*Schneider*, T.E., pág. 177.) En ocasiones la Junta de Gobierno expresa formalmente su sentir y sus recomendaciones en torno a determinadas controversias mediante acuerdos y resoluciones. Éstas tienen carácter muy variado e incluyen: procedimientos internos de carácter administrativo; aprobación de los estudios realizados por las diferentes comisiones del Colegio; asignación de asuntos a éstas para estudio; reconocimientos a distinguidos abogados y a funcionarios del Colegio; aprobación de programas de servicios legales a indigentes; educación legal continuada; intercambios jurídicos, culturales y sociales con abogados de otras jurisdicciones; programas de beneficios a los colegiados; actividades sociales; manifestaciones y expresiones sobre asuntos de interés general locales y externos. *Exhibits* 46–48 (1978–1984). (Para un breve resumen de los acuerdos y resoluciones de la Junta de Gobierno de 1976 a 1982, véase *Schneider, exhibits* 6a, págs. 17, 23; 6b, págs. 17, 23; 6c, págs. 17, 21; 6d, págs. 21, 25; 6e, págs. 19, 21; 6f, págs. 20, 22. Véanse además los *exhibits* 235, 35–50.) El funcionamiento administrativo del Colegio está a cargo de un Director Ejecutivo quien da cumplimiento a los acuerdos de la Junta de Gobierno y la mantiene informada de las operaciones del Colegio. T.E., págs. 13–14. El Director Ejecutivo es escogido por la Junta de Gobierno previa recomendación del Presidente. T.E., pág. 18.

Desde que el actual Presidente del Colegio, Lcdo. Abrahan Díaz González, entró en funciones, la Junta de Gobierno ha concentrado sus esfuerzos principalmente en dos áreas. En primer lugar ha laborado por tratar de resolver el problema de la educación legal en Puerto Rico. Mediante resolución al efecto solicitó al Tribunal Supremo que nombrara un comité para que actualizara un estudio que se había preparado sobre el examen de reválida. También ha hecho recomendaciones sobre el estado de las escuelas de derecho en Puerto Rico. T.E., págs. 368–369.

534

En segundo lugar, la Junta de Gobierno ha tomado gran parte de su tiempo en planificar un programa legislativo. Éste consiste en lograr la aprobación por parte de la Asamblea Legislativa de cuatro proyectos de ley relacionados con el funcionamiento del Colegio que aportarán significativamente a elevar la calidad de la profesión legal. El primer proyecto tiene como objetivo el conferir a la Junta de Gobierno del Colegio la facultad de fijar, dentro de ciertos parámetros, la fecha para celebrar las Asambleas Generales de la institución y las elecciones de los miembros de la Junta y Directiva de las Delegaciones. El segundo proyecto tiene el propósito de investir en la Comisión de Ética los poderes de investigación que tiene un Comité Legislativo, cuando se trata de la conducta profesional de los abogados. El tercer proyecto tiene el objetivo de aumentar el importe de la fianza que prestan los notarios para garantizar el fiel cumplimiento de sus obligaciones de $2,500 a no menos de $20,000. El cuarto proyecto tiene el propósito de crear una fundación independiente que habrá de sostenerse con los ingresos de un aumento en el importe de los sellos forenses y notariales. La nueva fundación proveerá los recursos físicos y de personal que necesita la institución para revisar sistemáticamente todos los códigos, todo el cuerpo de derecho y realizar para ello los estudios humanísticos necesarios con su propio personal de investigación. La fundación actual del Colegio llevaría a cabo el financiamiento por las exenciones y flexibilidad contributiva que tiene. *Exhibit* 51; T.E., págs. 369–386.

II. *Comisiones*

Gran parte de las actividades del Colegio se llevan a cabo a través de sus comisiones. A la fecha en que se celebraron las vistas ante el Comisionado existían alrededor de 35 comisiones. Se presentó una lista de algunas de las comisiones con sus respectivos presidentes. *Exhibit* 15. Algunas son de carácter permanente y otras de carácter transitorio. T.E., pág. 278. A

continuación se describen las actividades que realizan algunas de las comisiones.

A. *Comisión de Ética*

La Ley Orgánica del Colegio de Abogados, Ley Núm. 43, *supra*, le otorga al Colegio dos funciones básicas referentes a la conducta profesional. En primer lugar el Colegio de Abogados tiene la facultad de adoptar e implantar, con la aprobación del Tribunal Supremo, los Cánones de Ética que regirán la conducta de los abogados. 4 L.P.R.A. sec. 773 (f) ; T.E., pág. 215. En segundo lugar el Colegio tiene la facultad para recibir e investigar las quejas que se formulen respecto a la conducta de los abogados admitidos al ejercicio de la profesión en Puerto Rico, puede remitirlas a la Junta de Directores para que, después de una vista en la que el querellado tendrá la oportunidad de ser oído, de hallarse causa probable, instituya el correspondiente procedimiento de desaforo ante el Tribunal Supremo. 4 L.P.R.A. sec. 773 (g) ; T.E., págs. 215–216.

A tenor con el mandato legislativo, el reglamento del Colegio, en su Art. 45, ha investido en la Comisión de Ética las siguientes funciones relativas a la conducta de los abogados:

A—Investigar la conducta profesional de los colegiados bien a iniciativa propia o a requerimiento de la Junta de Gobierno y rendirá el informe correspondiente con recomendaciones específicas.

B—Emitir opinión a iniciativa propia o cuando lo solicite algún miembro del Colegio sobre conducta profesional o judicial siempre que en la opinión no se traten cuestiones relacionadas con fallos judiciales o con el ejercicio de la discreción de los tribunales. T.E., págs. 216–217.

El Lcdo. Manlio Arraiza Donate, miembro de la Comisión de Ética, declaró ante el Comisionado sobre el procedimiento de quejas que se sigue ante dicha comisión. T.E., págs. 215–241.

Cualquier ciudadano que tenga una queja en contra de un abogado puede acudir al Colegio y presentar un escrito al efecto. Una vez la queja es presentada, pasa a la consideración de uno de los miembros de la comisión. Si surge del escrito que existe una violación a los Cánones de Ética o si del escrito se puede inferir que hay causa fundada para creer que hubo alguna violación, se notifica al colegiado con copia del reglamento —*exhibit* 37— para que, dentro del tiempo reglamentario, conteste la queja. La contestación del colegiado se le envía al querellante para que éste a su vez haga los comentarios que estime necesarios. Luego de recibida la contestación del querellado, la comisión determina si procede archivar la queja o si por el contrario amerita la celebración de una vista. En la vista se le da amplia oportunidad a ambas partes a que estén representadas. Inclusive, el reglamento dispone que si el querellante desea tener representación legal el Colegio se compromete a brindársela. Entonces la comisión hace su determinación final que puede ser que no hay violación a los Cánones de Ética, en cuyo caso la querella se archiva. Si por el contrario se determina que el querellado ha incurrido en alguna violación de los Cánones de Ética, se ordena la preparación de un informe para ser sometido a la Junta de Gobierno. Antes de someter a la Junta de Gobierno este informe se notifica a ambas partes y se aprueba por la comisión en pleno. Se le notifica a las partes la fecha en que va a ser sometido a la Junta de Gobierno. Las partes pueden comparecer en esta fecha para defender su posición. Si la Junta de Gobierno adopta el informe, la queja se remite formalmente al Tribunal Supremo donde el procedimiento sobre conducta profesional comienza. T. E., págs. 217–220; Informe del Comisionado, págs. 51–52.

La Comisión de Ética está compuesta por doce miembros. T.E., pág. 226. Son nombrados por el Presidente del Colegio

con el consejo y consentimiento unánime de la Junta de Gobierno. T.E., pág. 227. Aunque los miembros de las otras comisiones del Colegio son nombrados por el Presidente, el nombramiento de los miembros de la Comisión de Ética requiere el consentimiento de la Junta de Gobierno debido a la delicada naturaleza de sus funciones y deberes. T.E., pág. 227.

La comisión cuenta con una persona contratada por el Colegio exclusivamente para hacer investigaciones a tarea parcial y una secretaria que hace los trámites administrativos. T.E., págs. 361–367. Con excepción de un receso de dos o tres semanas en navidades y la semana de la Asamblea Anual, la comisión se reúne todos los martes. En ocasiones se han hecho muchas más reuniones. Se reciben anualmente cerca de 300 a 400 quejas y se remiten al Tribunal Supremo de 15 a 35 por año. T.E., págs. 222–225.

Anualmente, la comisión rinde un informe en el cual se resumen las labores realizadas. *Exhibit* 37.

Del informe del 6 de julio de 1983 se desprende que la comisión ha realizado una serie de consultas sobre temas ético-legales, como por ejemplo: la aprobación o desaprobación de anuncios a ser publicados, el cobro de honorarios por referimiento de casos, el secreto profesional *vis-à-vis* la Sec. 7203 del Código de Rentas Internas federal y el conflicto de intereses en la representación de servicios legales voluntarios. *Exhibit* 37; T.E., págs. 235, 237–283.

La comisión también tiene un programa de orientación a los abogados. Si un abogado tiene alguna preocupación en torno a un problema de responsabilidad profesional, puede plantearla ante el Colegio. El Colegio rinde este servicio de consultas a los colegiados completamente gratis. T.E., pág. 471. Además se está planeando ofrecer a los colegiados conferencias sobre los Cánones de Ética profesional en cada una de las cabeceras de distrito de la isla. T.E., pág. 240.

B. *Comisión de Educación Legal y Mejoramiento Profesional*

Con el fin de mantener a los colegiados al día en el conocimiento del derecho, se creó la Comisión de Educación Legal y Mejoramiento Profesional. T.E., pág. 169. Está compuesta por jueces, profesores de las escuelas de derecho y abogados, reconocidos por su excelente preparación académica y experiencia profesional. T.E., págs. 168–169. A la fecha en que se celebraron las vistas ante el Comisionado, la comisión estaba presidida por el Lcdo. Salvador Acevedo Colón. T.E., pág. 168. La comisión auspicia el Instituto de Educación Práctica, una corporación sin fines de lucro organizada en el año 1979 y dedicada al mejoramiento de la profesión legal. T.E., pág. 244 y 248. Tiene su propio sistema de contabilidad y un auditor externo. T.E., pág. 248. Los miembros de la Comisión de Educación Legal y Mejoramiento Profesional son los directores del Instituto. T.E., pág. 172. El Presidente de la primera también lo es del segundo. T.E., pág. 168. El Instituto se creó para proveer mayor flexibilidad en la consecución de los objetivos de la comisión. T.E., págs. 243–245.

La comisión, a través del Instituto, ofrece a todos los colegiados una serie de seminarios, charlas y conferencias sobre distintas áreas del derecho. T.E., pág. 170. En algunos se cobra una cantidad nominal y otros se ofrecen completamente gratis. T.E., págs. 24, 170–171, 188.

Entre las actividades educativas que se han organizado están:

1. Seminarios para los nuevos abogados.
2. Seminarios sobre Daños y Perjuicios.
3. Problemas de la Ley de Evidencia.
4. Taller de trabajo sobre Planificación Patrimonial Sucesoral en Puerto Rico.
5. Seminario sobre *Injunction*.
6. Seminario Internacional del Derecho al Trabajo.
7. Seminario de Procedimientos Apelativos.
8. Seminarios de Procedimiento Civil.

9. Seminarios sobre Administración de Bufetes.
10. Seminario sobre la Ley Municipal, coordinado con la Administración de Servicios Municipales.
11. Seminario sobre Seguro Social.
12. Seminarios sobre Derecho Registral Inmobiliario.
13. Seminario sobre el Procedimiento en Vista Preliminar.
14. Seminario sobre la Ley Orgánica del Departamento de Asuntos al Consumidor (DACO).
15. Seminario sobre la Ley de Compensaciones por Accidentes del Trabajo.
16. Encuentro Internacional de Juristas. En éste participaron el profesor Andrés Tunk del Centro de Estudios Jurídicos Comparados de la Universidad de París, el profesor de Derecho de la Universidad de Harvard, Arthur Mergen, y el profesor de la Universidad de Tulane, Ferdinand Stund.
17. Seminario sobre Procedimiento de Apelación al Tribunal Supremo de Puerto Rico.
18. Seminario sobre la Cláusula *Due on Sale.*
19. Seminario sobre Contribuciones.
20. Seminario sobre el Manejo del *stress,* ofrecido por un panel de médicos.
21. Seminario sobre Planificación Sucesoral y la Ley de Caudales Relictos.
22. Seminario sobre Propiedad Mueble.
23. Seminarios sobre Quiebras.
24. Seminario sobre la responsabilidad de los médicos que prestan sus servicios en los hospitales.
25. Seminario sobre Impericia Médica. T.E., págs. 186–202, Informe del honorable Comisionado, págs. 46–48.

La comisión y el Instituto también ofrecen, dos veces al año, cursos de repaso para el examen de reválida a los aspirantes al ejercicio de la profesión. Los ingresos que percibe por dicho concepto permiten que el Instituto sea completamente autosuficiente, hasta el punto de haberle extendido un préstamo al Colegio. T.E., págs. 252, 255 y 257.

Con el propósito de asistir a los colegiados en su ingreso a la Corte de Distrito de Estados Unidos como abogados postulantes, el Instituto está organizando un curso de repaso que

cubrirá las diferentes áreas que se examinan en la reválida federal. T.E., págs. 175–176.

### C. *Comisión para el Estudio del Desarrollo Constitucional*

La Comisión para el Estudio del Desarrollo Constitucional está integrada por abogados de todas las visiones políticas. T.E., págs. 278, 420. Entre los estudios que ha realizado se destacan tres: la amenaza para el sistema democrático que constituye el problema de la corrupción en la Policía y otro sobre los medios directos de intervención que tiene el elector en el proceso político. El tercero es producto de una serie de informes sobre el problema del *status* de Puerto Rico. Uno de los informes, el cual fue aprobado unánimemente por los miembros de la comisión, recomienda unos requisitos mínimos que se deben garantizar bajo cualquier alternativa de *status*. A base de estos informes, el Presidente del Colegio ha comparecido ante las Naciones Unidas a presentar las recomendaciones de la comisión. *Exhibit* 36; T.E., págs. 278–280, 419–421.

### D. *Comisión de Legislación*

Según se desprende del Art. 45, inciso 2, del Reglamento del Colegio de Abogados, la Comisión de Legislación tiene las siguientes funciones asignadas:

(a) Estar atenta a toda legislación que se proponga y que en cualquier forma pueda afectar o afecte a la administración de la justicia, al ejercicio de la profesión, o la existencia y funcionamiento del Colegio de Abogados.

(b) Redactar sus informes por escrito, en los cuales previa la exposición de los fundamentos correspondientes, recomendará a la Junta de Gobierno aquellas medidas legislativas que estime pertinentes, preparando los proyectos de ley que fueren necesarios.

(c) Ofrecer a la Asamblea Legislativa toda cooperación cuando ésta le fuere solicitada al Colegio. *Exhibit* 1; T.E., pág. 137.

Además de las funciones reglamentarias, la comisión le provee información sobre legislación pendiente a ciudadanos u organizaciones que así lo solicitan. *Exhibit* 39; T.E., pág. 138.

La comisión está compuesta por colegiados designados por el Presidente del Colegio. T.E., pág. 153. La comisión examina los proyectos de ley que se han presentado en la Asamblea Legislativa y selecciona los que son de interés para el Colegio y para la práctica de la profesión legal. T.E., págs. 143–145.

La comisión no realiza cabildeo a favor de proyectos de ley en representación de ningún grupo o individuo. El criterio que usa la Comisión de Legislación para analizar y adoptar una posición en torno a una pieza legislativa es un análisis puramente legal. Se analiza la jurisprudencia, las leyes vigentes y se recomiendan cambios. T.E., págs. 146–148.

Entre noviembre de 1982 y enero de 1985 la Comisión de Legislación ha estudiado y comentado de 80 a 90 piezas legislativas. De éstas, la mitad aproximadamente fue comentada a solicitud de la Asamblea Legislativa y la otra mitad se estudió a iniciativa de la comisión a base de las prioridades y los asuntos de interés para el Colegio. T.E., págs. 151, 163–164.

E. *Otras Comisiones*

Ante el Comisionado también se recibieron informes sobre la labor que realizan otras comisiones. Véase la Sec. VI, *infra.* Entre éstas podemos señalar las siguientes: Evaluación de Nombramientos Judiciales; Derecho de Familia; Derecho Penal; Derecho Laboral; Proceso Electoral; Actos Públicos y Culturales; Defensa y Desarrollo de los Derechos de la Mujer; Derechos Humanos y Constitucionales; Para el Estudio de las Condiciones de Trabajo de los Abogados en el Servicio Público.

III. *Ayuda legal a indigentes*

El Colegio de Abogados fue el gestor principal en la creación de la Corporación de Servicios Voluntarios (Pro Bono). La oportunidad surgió cuando la Corporación de Servicios Legales de Washington determinó que asignaría determinada cantidad a asociaciones de abogados dispuestas a participar directamente en la ayuda a indigentes. El objetivo principal de Pro Bono es proveer servicios legales gratuitos a personas de escasos recursos económicos. El programa ofrece servicios en casos civiles y de menores. También brinda ayuda al Centro de Envejecientes de Carolina y a la Oficina de la Juventud adscrita a la Oficina del Gobernador. Estas dos entidades hacen aportaciones económicas a Pro Bono.

El programa Pro Bono funciona parcialmente con fondos federales y con la participación de abogados voluntarios del Colegio de Abogados. Además de la contribución original que hizo, el Colegio hace una aportación anual, calculada en $40,000, por concepto de renta del local. Pro Bono usa el local del Colegio y los servicios de imprenta. Su Junta de Directores está compuesta por el Director Ejecutivo del Colegio, dos directores designados por el Presidente del Colegio de Abogados, el Presidente de la Comisión de Ayuda Legal del Colegio de Abogados, dos abogados designados por el Director Ejecutivo de la Corporación de Servicios Legales y tres personas electas por la clientela en asamblea.

En el programa Pro Bono participan más de 800 abogados del Colegio y desde que se inició ha atendido 1,815 casos en el 1982; 3,688 casos en el 1983; y en el 1984 atendió 5,902 casos. Por su labor extraordinaria, el American Bar Association le otorgó el "Harrison Tweed Award" en el 1984. T.E., págs. 20–22; Informe del Comisionado, págs. 33–34. Véase el *exhibit* 3.

## IV. *Publicaciones*

El Colegio de Abogados publica o patrocina varias publicaciones: una revista jurídica, una publicación informativa mensual de las actividades del Colegio y de sus dependencias, informes de sus distintas comisiones, y las obras y otros escritos de autores abogados.

La Revista del Colegio de Abogados es fuente de cuantiosos artículos de derecho en todas sus áreas. En ella se han publicado artículos que han sido descritos como "retórica política o ideológica" con poca relación con los trabajos de una revista jurídica. *Schneider* v. *Colegio de Abogados de P.R.*, supra, págs. 969–970.[4] En la Revista en ocasiones se transcriben algunas de las resoluciones y procedimientos ante la Junta de Gobierno y de la Asamblea General, algunas de las cuales fueron catalogadas como de naturaleza ideológica. *Schneider*, supra, pág. 969, nota 16.

Sin discutir la corrección de aquellos pronunciamientos dentro del contexto del remedio que se diseña más adelante, observamos que los artículos aludidos tan sólo representan alrededor del 4, 4 y 15 por ciento del total de páginas impresas para los Vols. 39, 42 y 43 de la Revista del Colegio de Abogados respectivamente, o sea, alrededor del 7% de la totalidad de páginas publicadas en esos volúmenes. Dicho porcentaje necesariamente disminuye si se consideran aquellos volúmenes cuyos artículos, en su totalidad, son de carácter legal, no "ideológico". (Véase el *exhibit* 18; *Schneider*, *exhibits* 243–244.) Aun cuando anteriormente no se hacía, a partir de enero de 1984 la Revista del Colegio de Abogados explícita-

---

[4] Se refería a los siguientes artículos: J. Mari Brás, *La Jornada de 1978 en Naciones Unidas*, 42 Rev. C. Abo. P.R. 555–573 (1981); P. Aponte Vázquez, *Necator americanus: O Sobre la fisiología del caso Rhoads*, 43 Rev. C. Abo. P.R. 117–142 (1982); S. Marcksoud López e I. Serrano García, *El mito de la democracia: Apuntes sobre la cultura política puertorriqueña*, 43 Rev. C. Abo. P.R. 359–401 (1982).

mente notifica a sus lectores que no es responsable del contenido de los artículos publicados.

El Colegio ofrece un servicio de avanzada de las opiniones del Tribunal Supremo de Puerto Rico. Según el Tribunal emite sus opiniones, el Colegio las reproduce y confecciona un resumen de los hechos y un sumario normativo. *Exhibit* 24; T.E., pág. 29. El Colegio envía por correo dichas opiniones a todos los abogados que así lo desean libre de cargo adicional. T.E., pág. 30. A los no colegiados que desean suscribirse al servicio se les cobra $35 anuales. T.E., pág. 57.

El Colegio envía a todos los colegiados las "Notificaciones del Director Ejecutivo". Estas notificaciones incluyen: (1) órdenes administrativas de los tribunales; (2) cambios en las reglas de los Tribunales; (3) las resoluciones aprobadas por la Junta de Gobierno y la Asamblea; (4) los cursos y seminarios que ofrece la Comisión de Educación Legal y el Instituto de Educación Práctica; (5) los seminarios de derecho, conferencias, congresos, cursos y convenciones fuera de Puerto Rico; (6) el estado de la legislación presentada ante la Asamblea Legislativa y las leyes aprobadas por el Gobernador que tengan relación con la profesión, y (7) reglamentos de promulgación reciente por las agencias del Gobierno. En el servicio de notificaciones también se incluye información sobre oportunidades de empleo, venta de libros y oficinas, e información sobre la actividad de las comisiones. Véase el *exhibit* 19; T.E., págs. 30–32. Todos los colegiados tienen acceso a este servicio.

El Colegio colabora con la Oficina de Administración de los Tribunales en la publicación de una nueva revista, Forum. T.E., págs. 33–34. Esta nueva revista sustituyó la antigua Factum. *Exhibit* 20; T.E., pág. 282.

El programa de la Asamblea Anual de los colegiados es otro vehículo de comunicación escrita con la membresía. El reglamento requiere su publicación y remitir copia a todos los colegiados informándoles los resultados de la elección de

delegados en las Asambleas de Distrito. Art. 14, Reglamento del Colegio de Abogados. Un análisis de todos los programas demuestra que ofrecen información valiosa al colegiado sobre la administración y funcionamiento de la institución: estado de situación, ingresos y gastos, presupuesto, etc. Se informa además una sinopsis de las resoluciones y acuerdos adoptados por la Junta de Gobierno durante el año precedente. En adición, presentan una breve exposición de las actividades sociales, educativas y de diversa índole celebradas por el Colegio de Abogados, sus órganos rectores y sus comisiones, asumiendo las actividades desplegadas por la institución en el año precedente. (*Schneider, exhibits* 6a–6f.) Usualmente la Asamblea Anual es dedicada a algún tema de interés o a una persona distinguida. *Exhibits* 42–45. El tema o persona al cual se va a dedicar la asamblea es escogido por la Junta de Gobierno del Colegio. T.E., págs. 393–396. En *Schneider*, supra, se señalaron algunos de estos programas cuyas portadas y mensajes del Presidente fueron caracterizados como ideológicos. *Schneider*, supra, pág. 970.

En ocasiones el Colegio, con la aprobación de la Junta de Gobierno, publica los informes de sus comisiones. (*Schneider, exhibits* 245; 252; 253; 244, págs. 619–634; 22–24; véanse además los *exhibits* 234 y 236.) También publica o coauspicia la publicación de obras de autores abogados que aportan al derecho puertorriqueño. Véase el *exhibit* 23. (*Schneider, exhibit* 8.)

## V. *Facilidades físicas*

En su sede de Miramar el Colegio tiene sus oficinas administrativas, la oficina del Presidente, la oficina de imprenta, las oficinas de la Comisión de Ética y la Comisión de Educación Legal, y un restaurante-barra. También cuenta con un salón de actos con capacidad para 450 personas, el salón de la Junta de Gobierno, con capacidad para 75 personas, y una sala de lectura. T.E., págs. 34, 41. Estos últimos

tres locales junto al vestíbulo del edificio del Colegio están disponibles para el uso de entidades privadas o individuos que paguen un canon de arrendamiento y cumplan con las normas de arrendamiento de los locales del Colegio. *Exhibit* 21; T.E., pág. 34.

También se usan estos locales para que los abogados celebren actividades familiares y profesionales por un canon de arrendamiento equivalente a la mitad del que pagan los no colegiados. Hay un listado de unas organizaciones que han sido exentas de pago por la Junta de Gobierno, con excepción de un cargo mínimo por mantenimiento, a saber: la Corporación de Servicios Legales, la Sociedad de Asistencia Legal, la Asociación de Registradores de la Propiedad, la Asociación de Abogados Católicos, la Asociación de Abogados Evangelistas, la Asociación de Esposas de Abogados, el Instituto de Educación Práctica, la Fundación del Colegio, la Égida del Colegio, el Consejo de Presidentes, la Asociación Nacional de Estudiantes de Derecho, la Asociación de Abogados Postulantes ante la Comisión Industrial, el Instituto de Derecho Notarial y Registral, la Asociación de Fiscales, la Asociación de Amigos y Familiares de Confinados, el Federal Bar Association, la Asociación de la Judicatura, el Puerto Rico Bankrupcy Bar Association, el Centro de Estudios de Derecho Comparado, el Capítulo Luis Muñoz Morales de la Fraternidad Legal *Phi Alpha Delta*, el Instituto de Derechos Civiles, la Asociación de Mujeres de la Judicatura, la Asociación de Graduados de la Universidad Interamericana, la Fundación de Derecho Puertorriqueño, las Comisiones del Colegio y las Delegaciones de Distrito del Colegio. El personal del Colegio también está exento de pago. *Exhibit* 21; T.E., págs. 35-38.

El uso de los locales se le concede a todo el que lo solicita sujeto a las normas de orden establecidas y al pago del correspondiente canon de arrendamiento. T.E., págs. 38-39; 509. Según el testimonio incontrovertido del Presidente del Colegio, en el alquiler de los locales no existe ningún tipo de dis-

crimen por razón del contenido del mensaje o por la afiliación del arrendatario. T.E., pág. 511.

En dichas facilidades se han realizado reuniones, vistas públicas y actividades sociales de todo tipo. Distintos grupos celebran sus conferencias de prensa en las facilidades físicas del Colegio de Abogados: uniones obreras, partidos políticos, grupos políticos, estudiantes, organizaciones artísticas, organizaciones sociales, organizaciones cívicas, organizaciones religiosas, grupos disidentes y de protesta, etc. (*Schneider*, T.E., pág. 153.) Otros celebran sus reuniones periódicas o de organización. Estas facilidades también se utilizan para llevar a cabo audiencias de arbitraje y vistas públicas. Son muchas y variadas las actividades sociales y artísticas que se realizan en el Colegio de Abogados como por ejemplo fiestas de los colegiados o sus familiares, conciertos, obras teatrales, exhibición de películas, graduaciones, bailes, banquetes, concursos de belleza o moda, etc. *Exhibit* 22. (*Schneider, exhibits* 247, 248–249; 1, págs. 1–11.)

VI. *Descripción de los exhibits presentados ante el Comisionado*

1. Reglamento vigente del Colegio de Abogados de Puerto Rico. (*Schneider, exhibit* 4.)

2. Fotocopia del Certificado de Incorporación de la Fundación Colegio de Abogados de Puerto Rico y la carta de trámite.

3. Informe de la Lcda. María Inés Cartagena Colón, Directora Ejecutiva de Pro Bono, Inc., Servicios Voluntarios del Colegio de Abogados de Puerto Rico, de fecha 10 de enero de 1985.

4. Los Artículos de Incorporación de Servicios Legales Voluntarios del Colegio de Abogados de Puerto Rico, conocido también por Pro Bono, Inc.

5. Reglamento de Servicios Legales Voluntarios del Colegio.

6. Lista de los casos y la cantidad de los mismos llevados por Pro Bono desde junio de 1981 hasta junio de 1982, divididos en temas.

7. Comunicación de los Presidentes del Standing Committee on Legal Aid and Indigent Defendants del American Bar Association y de Benjamín Lerner, Presidente del National Legal Aid and Defendants Association, dirigidas al Lic. Arturo Negrón García, Presidente del Colegio de Abogados de 12 de julio de 1984.

8. Copia fotostática del boletín Cornerstone del National Legal Aid and Defender Association, Vol. 6, Núm. 4, con relación a los "Harrison Tweed Awards". Publicación que da la noticia del premio que se le otorgó al Colegio de Abogados.

9. Comunicaciones que se presentaron al Comité de Premios con relación a la propuesta para solicitar el premio y que describen los méritos de la propuesta y las actividades.

10. Comunicado de prensa del Colegio de Abogados, con relación al premio, acompañando una fotocopia de un artículo publicado en El Reportero, con fecha 19 de mayo de 1984 y titulado "El Colegio de Abogados sirve a los pobres".

11. Lista de abogados que han demostrado interés en tomar adiestramiento en los servicios legales voluntarios.

12. Compendio publicado por Servicios Voluntarios del Colegio de Abogados, indicando los servicios que ofrece, los procedimientos para elegir los servicios, los criterios de elegibilidad, los deberes del cliente y otras materias relacionadas con el programa.

13. Programa e invitaciones de los seminarios ofrecidos por Servicios Legales Voluntarios, con una lista de los mismos, anuncios publicados en la prensa y otra documentación miscelánea relacionada con los seminarios y los cursillos que se ofrecen.

14. Documentos relacionados con el Instituto de Educación Práctica del Colegio de Abogados, con una lista de las

actividades celebradas por la Comisión de Educación Legal y Mejoramiento del Abogado, desde el 1979 hasta el 1984. Se acompañan las distintas convocatorias de los seminarios y cursos.

15. Lista de algunas de las comisiones del Colegio con sus presidentes.

16. Copia del presupuesto del Colegio de Abogados para el 1985 aprobado por la Asamblea General efectuada el 4 de septiembre de 1984.

17. Copia de la Resolución Núm. 1 aprobada por la Asamblea del Colegio de Abogados el 3 de septiembre de 1983.

18. Sumario de los índices de los temarios de la Revista del Colegio de Abogados de 1974 a 1983.

19. Notificaciones del Director Ejecutivo enviadas a los colegiados durante 1983 y 1984.

20. Publicaciones que se hicieron hasta diciembre de 1984 del Boletín "Factum" y de "La Toga"; Boletín de Derecho Laboral publicado por el Colegio de Abogados durante los años 1981–1984.

21. Documentos relacionados con las normas para solicitar el arrendamiento de los locales del Colegio de Abogados.

22. Lista del uso de facilidades que contiene las actividades celebradas en el Colegio desde 1982 hasta 1984.

23. Copia de las publicaciones del Colegio de Abogados, a saber:

a. Reglamento para la ejecución de la Ley Hipotecaria y el Registro de la Propiedad de 1979, publicado en 1980.

b. Servicio de Legislación del Colegio de Abogados, la Ley Hipotecaria y del Registro de la Propiedad, Ley Núm. 198 de agosto 8 de 1979.

c. *Los abogados de Puerto Rico, Fundamento para una Sociología de la Profesión Legal,* por el Lcdo. Jaime B. Fuster, ed. 1984. (*Schneider, exhibit* 8.)

d. *Código Penal Comentado,* ed. 1975.

e. *Procedimientos Apelativos Civiles,* de los Lcdos. Álvaro Calderón, Jr., y David Rivé Rivera, publicado en febrero de 1978.

f. *Instrucciones al jurado para el Tribunal Superior de Puerto Rico,* 2da ed., 1979.

g. *Los Derechos del Acusado,* por el Lcdo. Ismael Betancourt y Lebrón, publicado en 1975.

h. *Toga Lírica,* de la Lcda. Alma Delgado de Torres.

i. *La Filiación en Puerto Rico,* del Lcdo. Álvaro Calderón, Jr., 1978.

j. Índice General de la Revista de Legislación y Jurisprudencia de la Asociación de Abogados de Puerto Rico, de la Sra. Vilma Rivera de Bayrón, de la Biblioteca de Derecho de la Universidad de Puerto Rico.

k. Folletos en relación con la Comisión de Educación Legal a la Comunidad.

*l.* Reglas de Procedimiento Civil de 1979.

m. Reglas de Evidencia de 1979.

n. Informe al Hon. Gobernador del Estado Libre Asociado de Puerto Rico, del Comité para el Estudio de los Derechos Civiles, 1959.

*o.* Prontuario de Ética de la Lcda. Eliadís Orsini Zayas, 1983.

p. Folleto que contiene el Código de Ética que regirá la conducta de los abogados en la profesión legal de Puerto Rico.

q. Índice de la Jurisprudencia del Tribunal Supremo de Puerto Rico desde mayo de 1981 a mayo de 1982.

r. Lista de entidades comerciales que brindaban servicios al Colegio, con unos descuentos globales.

s. *América a través de sus mujeres jueces,* publicado en septiembre de 1981.

t. *Los derechos de los retardados mentales,* septiembre de 1978.

u. *Glosario de términos jurídicos para los periodistas,* 1984.

v. *Prontuario histórico del Grito de Lares,* etc.

w. *La Ley Notarial,* ed. rev. de mayo de 1981.

x. Discurso pronunciado por el Hon. José Trías Monge en la Asamblea del Colegio de Abogados de 1975.

y. *Mujer, Conoce tus Derechos,* de la Comisión para el Mejoramiento de los Derechos de la Mujer, publicado en junio de 1978.

z. *Reglas para la administración del Tribunal de Primera Instancia,* 1975.

aa. Discurso pronunciado por el Lcdo. Marcos A. Ramírez en la Asamblea de Ponce de 1972.

24. Opiniones del Tribunal Supremo de Puerto Rico que se circularon a los colegiados en 1983 y 1984.

25. Informe de la Comisión de Derecho de Familia del Colegio sobre trabajos realizados en los últimos años. Este *exhibit* contiene un resumen de las gestiones de la comisión entre 1980 y 1984, entre otras: el proyecto de orientación a la comunidad conocido como "La Ley al Alcance de tu Mano", que constituye un esfuerzo para explicar al ciudadano, en términos sencillos, sus derechos y obligaciones bajo las leyes que gobiernan las relaciones de familia, de manera que, en la medida posible, el ciudadano pueda entre otras cosas, valerse por sí mismo ante los tribunales. Contiene también una separata del artículo que se incluyó en las ediciones del diario El Vocero, que tiene una circulación diaria de 206,800 ejemplares, durante los días 5 y 10 de septiembre de 1983. La comisión formuló estudios sobre proyectos de la ley relacionados con los derechos de los niños de Puerto Rico y sobre otra legislación relacionada con Derecho de Familia.

La comisión organizó además una serie de conferencias en torno al Derecho de Familia, sobre la condición de la mujer, custodia y patria potestad.

26. Resumen de las actividades de la Comisión de Actos Públicos y Culturales. Este *exhibit* contiene una relación de las actividades de la comisión entre 1979 y 1984, a saber: foros, conferencias, exhibiciones y actos sociales relacionados con la profesión entre otros, conferencias por profesores distinguidos de la Universidad de Georgetown, colaboraciones con la Comisión de Derecho Laboral, seminarios sobre Cabil-

deos, Recursos Naturales, Derechos Civiles, Desempleo, Historia, Problemas de la Mujer y otras actividades culturales y profesionales.

27. Resumen de las actividades de la Comisión para la Defensa y Desarrollo de los Derechos de la Mujer entre 1981 y 1984. Este *exhibit* relaciona detalladamente las múltiples reuniones, foros, conferencias y seminarios sobre problemas relacionados con los Derechos de la Mujer. Detalla, además, las comparecencias de la comisión a vistas públicas legislativas con relación a proyectos relacionados con los trabajos de la comisión en beneficio de la mujer. Para dar un ejemplo de la naturaleza de estas actividades basta señalar:

A. Foro de tres días sobre *América vista a través de sus mujeres jueces,* en el que participaron mujeres jueces de Venezuela, Chile, Nicaragua, Estados Unidos y Puerto Rico para explorar el rol de la mujer en la Judicatura de sus países respectivos.

B. Gestiones de la comisión ante la Legislatura en apoyo de proyectos que tenían el propósito de establecer centros de cuidado diurno en las fábricas y centros industriales.

C. Foro de tres días sobre los derechos de la mujer trabajadora para uniones y organizaciones femeninas, con asistencia de aproximadamente 1,000 personas.

D. Foros sobre Derecho de Familia y sobre La Mujer y la Literatura.

28. Este *exhibit* contiene un resumen de trabajo de la Comisión sobre Proceso Electoral durante 1984. Esta comisión fue creada por la Junta de Gobierno para enaltecer el nivel del debate político en el país, hacer cumplir las leyes relacionadas con el proceso de votación y elaborar un código de normas éticas que orientara el debate público entre los candidatos políticos.

La comisión, integrada por abogados de todas las tendencias políticas, celebró audiencias a las cuales comparecieron casi todos los candidatos de todos los partidos a cargos públicos de alto nivel. La comisión publicó el Código de Ética

electoral en todos los periódicos del país, algunos de los cuales editorializaron encomiando la gestión del Colegio y exhortaron a los candidatos a cumplir con las normas establecidas por el Código de Ética. La importancia de la gestión se evidencia por la participación de la Iglesia Católica, el Concilio Evangélico, la Asociación Médica, el Colegio de Ingenieros, Colegio de Farmacéuticos, Colegio de Químicos, Colegio de Dentistas y de Cirujanos Dentistas, Colegio de Diseñadores, Club Rotario y la Fundación de las Humanidades.

29. Informe de la Comisión de Evaluación de Nombramientos Judiciales. Este *exhibit* contiene una relación de los trabajos de la comisión entre 1979 y 1984, entre otros, la evaluación anual de cientos de candidatos a ocupar cargos en la Judicatura, comparecencias ante el Comité de Nombramientos del Senado de Puerto Rico, con relación a la confirmación de los nombramientos judiciales hechos por el Gobernador.

La labor de evaluación de aspirantes y candidatos a la Judicatura es una que realiza la comisión en forma continua y sistemática. Además, en ocasión de la celebración de una conferencia judicial, la comisión presentó una ponencia sobre "La Selección de Jueces en Puerto Rico".

30. Informe de la Comisión sobre Planes Legales Grupales y Comisión de Seguros. Este *exhibit* relaciona los esfuerzos realizados entre los años 1976 hasta la fecha con relación al establecimiento del plan de seguro de vida de los colegiados. Actualmente, cada colegiado disfruta de un seguro de vida de $15,000 con derecho a doble indemnización en caso de muerte accidental.

La Comisión está estudiando desde hace años la posibilidad de establecer unos planes de servicios legales grupales prepagados.

31. Informe de la Comisión de Derecho Registral y Notarial entre 1978 y 1984. La Comisión participó en el II Con-

greso Internacional de Derecho Registral en Madrid (1974);
en el Foro Nacional de Notariado y Registro en Neiva, Co-
lombia (1976); en el IX Encuentro Panamericano en San
José, Costa Rica (1976), y en el II Congreso Internacional de
Derecho Registral en Puerto Rico (1977). Durante 1978,
1979 y 1980 celebró una serie de seminarios con relación al
Proyecto de Ley Hipotecaria y luego sobre la Ley Hipotecaria
aprobada y su reglamento. Participó en esos años en varias
gestiones legislativas sobre proyectos relacionados con la Ley
Hipotecaria. En 1981 organizó varios seminarios. En 1982 y
1984 participó en el Congreso Internacional de Derecho
Registral.

32. Informe de la Comisión de Derecho Penal. Este *ex-
hibit* constituye un resumen de la obra realizada por la Comi-
sión de Derecho Penal desde 1979.

En 1979 la comisión celebró el Congreso Nacional contra
la Criminalidad. La Primera Jornada, celebrada el 7 de fe-
brero, incluyó una serie de foros y conferencias sobre "El im-
pacto de los medios de comunicación ante la criminalidad en
Puerto Rico". La Segunda Jornada, celebrada el 19 de sep-
tiembre, giró en torno al tema "Rehabilitación v. castigo: la
función del sistema criminal". La Tercera Jornada, el 10 de
octubre, tuvo como tema central "La criminalidad conocida y
desconocida: estudio de un caso". La Cuarta Jornada, el 24
de octubre, giró en torno al tema "Profesionales de la ley y
de la conducta humana", el cual enfoca el problema de la de-
lincuencia juvenil. La Quinta Jornada giró en torno a "La
fianza criminal y la discreción judicial".

De 1982 a 1984 la comisión ofreció asistencia legal a con-
finados; atendió querellas de confinados contra la Adminis-
tración de Corrección; participó en audiencias legislativas
sobre proyectos relacionados con el Derecho Penal, el Derecho
Procesal Penal y Derecho de la Prueba; representó a indigen-
tes ante el Tribunal Supremo; preparó un informe a la Junta
de Gobierno titulado "Prestación de fianzas en ausencia," y

asesoró al Presidente de la institución en materia de Derecho Penal.

33. Informe de la Comisión de Derechos Humanos y Constitucionales entre 1976 y 1984. Durante este período esta comisión preparó un informe sobre "El derecho de los ciegos a la secretividad de su voto". Otro con relación a una querella formulada por los Testigos de Jehová en un caso en que uno de sus feligreses fue objeto de una transfusión de sangre contra su voluntad. Formuló, además, un informe sobre la intercepción de comunicaciones por la Puerto Rico Telephone Company, y otro sobre los Derechos Civiles de los estudiantes ciegos del Instituto Loaíza Cordero. Participó en varios programas televisados sobre la condición jurídica de las mujeres, Derecho Constitucional a la fianza y proyectos sobre los pasquines. Compareció ante las Cámaras Legislativas y discutió varios proyectos que afectaban los derechos civiles de los ciudadanos.

34. Este *exhibit* constituye un resumen de la labor de la Comisión de Derecho Laboral de 1979 a 1984. En 1979 la comisión realizó un estudio del proyecto sobre la sindicalización de los empleados públicos; atendió, además, consultas que le formuló la Comisión de Orientación Legal y la Directora Ejecutiva de la institución.

En 1980 la comisión coauspició, con la Comisión para Combatir el Discrimen por Razón de Sexo, un seminario y taller sobre los problemas que confronta la mujer en el empleo. Participó además en un seminario auspiciado por el Consejo de Educación y Derecho de la Comunidad. En 1981 sometió a la Asamblea Legislativa varios informes sobre tres (3) proyectos relacionados con los derechos de los empleados en caso de despido. En 1982 comenzó a publicar trimestralmente la revista "Boletín Laboral". Organizó una conferencia sindical, coauspició una conferencia sobre la mujer trabajadora y organizó un seminario sobre Derecho Laboral.

En 1983 preparó para la Legislatura de Puerto Rico un proyecto sobre la Ley de Cierre y participó en un panel sobre la sindicalización de los empleados públicos. Además, depuso en varias vistas celebradas por la Asamblea Legislativa.

En 1984 participó en un seminario sobre la tramitación en los tribunales de una reclamación laboral y sobre diversos aspectos de la nueva legislación laboral. Atendió consultas sobre la legislación laboral pendiente ante la consideración de la Legislatura y presentó a la Legislatura una ponencia sobre la Ley de Cierre.

35. Comisión para el Estudio de las Condiciones de Trabajo de los Abogados en el Servicio Público. Este *exhibit* contiene una relación del trabajo de una comisión especial que operó entre 1976 y 1980, con el propósito de mejorar las condiciones de trabajo de los abogados en el Servicio Público.

Publicó los siguientes informes:

Sobre la Garantía de Permanencia para los Abogados en el Servicio Público (1976); Sobre Normas de Reclutamiento, Ascensos, Sueldos y Revisión de Sueldos de los Abogados en el Servicio Público (1978); Sobre Técnicas Paralegales y la función que realizan en el Gobierno (1978); Sobre la Ley de Retribución Uniforme (1979), y Sobre las Actividades de la Comisión que resultaron en un aumento de sueldo de $50 a $150 mensuales para los abogados en el Servicio Público.

36. Este *exhibit* relaciona la labor de la Comisión para el Estudio del Desarrollo Constitucional de Puerto Rico entre 1977 y 1984. Durante este período la comisión ha publicado entre otros, los siguientes informes: Requisito Procesal para la Descolonización (1977); La Situación Actual del Proceso de Descolonización de Puerto Rico y el Caso de Puerto Rico ante el Comité de Descolonización de la Organización de las Naciones Unidas (1979); Factores Externos que Afectan el Sistema Constitucional de Puerto Rico (1981), y La Urgencia de Reformar la Policía para Proteger la Democracia (1984).

37. Este *exhibit* contiene un resumen de la labor realizada por la Comisión de Ética entre 1976 y 1984. Su informe evidencia la atención de cientos de querellas todos los años, a través de reuniones sistemáticas cada semana. El informe revela que durante el período entre junio de 1982 y mayo de 1984 la comisión atendió más de 1,016 casos activos de querellas y consultas, resolvió 543 asuntos y dejó pendientes 473.

El Colegio como consecuencia del trabajo de la comisión sometió 18 casos al Tribunal Supremo. La comisión presentó ante la Junta de Gobierno de la institución otros 12 casos. La comisión celebró 36 sesiones ordinarias, 10 extraordinarias y 25 vistas, en las cuales se atendieron 170 casos. Publicó, además, un folleto de orientación general sobre la ética profesional.

38. Este *exhibit* contiene los siguientes informes presentados por una serie de comisiones misceláneas:

a. Informe especial sobre enmienda a la Regla 11 del Reglamento del Tribunal Supremo de Puerto Rico.

b. Informe final de la Comisión de Reestructuración del Colegio de Abogados.

c. Informe sobre investigación realizada por la Comisión Pro-Reforma Carcelaria en la Cárcel de Humacao.

ch. Informe preliminar de la Comisión sobre Conflicto entre Residentes de Vieques y la Marina de Estados Unidos.

d. Memorando sobre Informe Anual de Trabajo y Proyectos para el 1985 de la Comisión de Asuntos del Consumidor.

e. Informe de la Comisión encargada de la Revisión del Código de Comercio.

f. Informe de actividades realizadas por la Comisión Especial para Producir Programas de Servicio Público, durante el período del 17 de octubre y el 31 de diciembre de 1979.

g. Informe de la labor realizada por la Comisión Organizadora de la XXI Conferencia de la Federación Interamericana de Abogados.

h. Informe semestral de la Comisión de Derecho Tributario, al 31 de marzo de 1979.

i. Informe de la Comisión de Orientación Legal a la Comunidad.

j. Informes de la Comisión de Estudio y Revisión del Reglamento de Personal del Colegio de Abogados.

k. Informe de la Comisión Especial sobre Armamentos Nucleares y el Tratado para la Proscripción de las Armas Nucleares en la América Latina.

l. Informe de la Comisión de Becas y Fondo de Montepío.

ll. Informe de la Comisión para el estudio del Funcionamiento del Centro Judicial de San Juan.

m. Informe para la Designación de una Comisión Especial para Investigar Ataques en la Prensa a Distinguidos Abogados.

n. Informe de la Comisión para el Estudio Propuesta Demarcación Territorial de las Delegaciones de San Juan y Río Piedras.

ñ. Informe sobre las gestiones realizadas por la Comisión Especial con relación a la posibilidad de adquirir los terrenos de Campo Chico en el Barrio Río Cañas de Caguas para el establecimiento del Centro Vacacional y Recreativo del Colegio de Abogados y posiblemente la Égida de Abogados.

o. Informe de la Comisión para establecer la Égida del Colegio de Abogados.

p. Memorando-Informe de la Comisión en Torno a la Resolución en el caso de Julio Irving Rodríguez Torres.

q. Carta informativa sobre los logros alcanzados por la Comisión de Ayuda y Orientación al Abogado.

r. Informe sobre la Comisión de Ayuda y Orientación al Abogado.

s. Actas de reunión del 23 de septiembre de 1983, de la Comisión sobre Relaciones entre Jueces, Fiscales, Registradores y Abogados.

t. Acta de la reunión del 19 de octubre de 1983, de la comisión mencionada en el apartado anterior.

u. Acta de la reunión del 16 de noviembre de 1983 de la comisión anteriormente mencionada.

v. Acta de la reunión del 14 de diciembre de 1983 de la comisión anteriormente mencionada.

w. Acta de la reunión del 18 de enero de 1984 de la comisión anteriormente mencionada.

x. Carta del Lcdo. Melvin A. Padilla de 13 de enero de 1984.

y. Carta del Sr. Luis V. Castro, dirigida al Lcdo. Arturo Negrón García, del 31 de enero de 1984.

z. Acta de la reunión del 16 de febrero de 1984 de la Comisión sobre Relaciones entre Jueces, Fiscales, Registradores y Abogados.

aa. Informe sobre incidente alegadamente ocurrido en el caso 75-208, en el Tribunal Superior, Sala de San Juan, entre el Hon. Wilfredo Roberts y el Lcdo. R. R. Rivera Correa.

bb. Informe de la Comisión para Estudiar situación jurídica del Canal de Panamá.

cc. Memorando de la Comisión para Gestionar Empleo a los Abogados Desempleados y Nuevos Colegiados.

39. Este *exhibit* contiene un bosquejo de la labor realizada por la Comisión de Legislación, preparado por su presidenta, Lcda. Georgina Candal Segurola, correspondencia y una relación de otras actividades profesionales. Con relación a la labor de esta comisión declaró extensamente la licenciada Candal durante las vistas celebradas el 22 de enero de 1985. T.E., págs. 135–166.

40. Este *exhibit* contiene una serie de informes sobre la labor que realiza la Comisión de Educación Legal y Mejoramiento Profesional, a través de su Instituto de Educación Práctica desde 1978 hasta 1984. Relaciona sus múltiples actividades, a saber: conferencias, foros y organización de unos cursos de repaso para la reválida, dos veces al año.

41. Este *exhibit* contiene una muestra de los programas de las asambleas de 1978 a 1984.

42. Este *exhibit* contiene copia de las resoluciones adoptadas en la Asamblea General del Colegio de Abogados del 6 de septiembre de 1980, a saber:

Resolución Núm. 1—"La deseabilidad de que la Junta de Gobierno tome medidas para adquirir el solar que colinda con la propiedad del Colegio en Miramar por el este."

Resolución Núm. 2—"Censura la indiferencia de autoridades correspondientes por el estado de las prisiones y la violación de los derechos constitucionales y humanos de los reos. Pide al Gobierno medidas de seguridad adecuadas, tratamiento humano de los convictos y ofrece la colaboración del Colegio para mejorar el sistema carcelario."

Resolución Núm. 3—"Evidencia la preocupación del Colegio por el discrimen contra la mujer y manifiesta la disposición de la Institución a defender sus derechos en todos los aspectos de la vida puertorriqueña."

Resolución Núm. 4—"Extiende reconocimiento a un capítulo estudiantil del Colegio de Abogados representado por la Asociación Nacional de Estudiantes de Derecho."

43. Este *exhibit* contiene el informe del Comité de Resoluciones que fue designado por el Presidente del Colegio de Abogados y copia certificada de las nueve (9) resoluciones aprobadas por la Asamblea de 1982, a saber:

Resolución Núm. 1—"Solicita de la Junta Directiva del Colegio que reevalúe su decisión de darse de baja de la Unión Internacional del Notariado Latino. Encomienda a dicha Junta que reinstale al Colegio en la matrícula de dicha Unión Internacional del Notariado Latino."

Resolución Núm. 2—"Crear una Comisión Permanente de Finanzas, Planificación, Presupuesto y Uso de Recursos en el Colegio de Abogados."

Resolución Núm. 3—"Censura el proceso legislativo que culminó en la aprobación de las leyes 3, 4, 5 y 6 del 12 de agosto de 1982, aumentando los aranceles de los tribunales, las escrituras y del Registro de la Propiedad, en forma sorpresiva y sin celebración de vistas."

Resolución Núm. 4—"Condena la prohibición impuesta por el gobierno de Estados Unidos sobre los ciudadanos de Puerto Rico que querían asistir a los decimocuartos juegos deportivos y del Caribe a celebrarse en La Habana, Cuba."

Resolución Núm. 5—"Establece que el cargo del Director Ejecutivo debe ser ocupado por un abogado admitido al ejercicio de la profesión."

Resolución Núm. 6—"Solicita del Secretario de Justicia que investigue alegaciones y alteraciones de la minutas de las reuniones celebradas por el Instituto de Cultura Puertorriqueña."

Resolución Núm. 7—"Expresa la preocupación de la Institución por el clima de tensión de las relaciones internacionales, condena la carrera armamentista, expresa preocupación por la amenaza de los armamentos nucleares en Puerto Rico y pide la designación de una Comisión para estudiar el Tratado de Tlatelolco, el impacto que las armas nucleares puedan tener sobre la salud, el ambiente, economía, etc. de Puerto Rico."

44. Este *exhibit* contiene las resoluciones adoptadas en la Asamblea de 1983, a saber:

Resolución Núm. 1—"Para designar las fuentes de ingresos que se utilizarán para sufragar los gastos del seguro de vida de los colegiados, establecer que en lo sucesivo dicho seguro de vida se sufragará de los ingresos provenientes del 80% de los sellos forenses, de los fondos provenientes del restante 20% de sellos forenses, o sea, del total proveniente de sellos forenses, más de las 2/3 partes de los fondos provenientes de la venta de sellos notariales. En caso de sobrante de las fuentes antes indicadas, éste debe utilizarse para los mismos fines de servicio público que por ley se deben sufragar de los ingresos provenientes de sellos notariales. Dispuso, además, que si las fuentes de ingresos no fueran suficientes para sufragar el importe del seguro de vida, entonces se utilicen los fondos que sean necesarios de los ingresos provenientes de las cuotas de colegiación."

Resolución Núm. 2—"Solicita de la Cámara de Representantes que posponga la aprobación del Proyecto del Senado Núm. 534—'Para reglamentar el ejercicio de la profesión notarial de Puerto Rico'."

Resolución Núm. 3—"Extendió el reconocimiento de la institución a los compañeros José Portuondo y de Castro, Héc-

tor Reichard Cardona y Pedro Mantellini por los valiosos servicios prestados a la profesión."

Resolución Núm. 4—"Reafirma la voluntad de la institución de que se elimine la Corte federal en Puerto Rico. Expresa la preocupación de la institución por la forma destemplada en que se han conducido algunos de los jueces de la Corte federal en Puerto Rico y consigna la preocupación del Colegio por el menoscabo que delata la conducta de dichos jueces a nuestro Tribunal Supremo, a nuestra Asamblea Legislativa y al Colegio de Abogados."

45. Este *exhibit* contiene un informe de los trabajos del Comité de Resoluciones de la Asamblea General, celebrada el 7 de septiembre de 1984 y una copia de las resoluciones adoptadas por la Asamblea, a saber:

Resolución Núm. 1—"Consignando la oposición del Colegio al nombramiento del Hon. Juan R. Torruella como juez del Tribunal de Apelaciones para el Primer Circuito, porque aunque en sus actuaciones judiciales adjudica libre de criterios personales y externos al proceso judicial, en controversias matizadas de carácter ideológico no supera sus creencias personales."

Resolución Núm. 2—"Acepta las recomendaciones del informe de la Comisión Especial sobre Armamentos Nucleares y el Tratado para la Proscripción de las Armas Nucleares en la América Latina, y solicita de la comisión que siga examinando todo lo relacionado con armas e instalaciones en Puerto Rico para que rinda los informes pertinentes."

Resolución Núm. 3—"Solicita de la Asamblea Legislativa la aprobación de una medida para eliminar el requisito del uso de dos testigos de conocimiento en los afidávit sobre autenticidad y que limite dicho requisito al uso de un solo testigo."

Resolución Núm. 5—"Respalda los proyectos del Senado 693 y de la Cámara 1024 que dispone el traslado a la Rama Judicial la Oficina de la Dirección Administrativa del Registro de la Propiedad."

Resolución Núm. 6—"Expresa la preocupación de la institución por la práctica de cacheo indiscriminado de los abo-

gados en el Centro Judicial de San Juan y en el Tribunal de Distrito de Estados Unidos para Puerto Rico."

Resolución Núm. 7—"Consigna el rechazo de la institución a la conducta del Secretario de Justicia, Lcdo. Nelson Martínez Acosta, y solicita su destitución del cargo que ocupa y que se investigue su conducta profesional por la Comisión de Ética del Colegio."

Resolución Núm. 8—"Rechaza la ingerencia injustificada de la Corte federal en la determinación de la elegibilidad de los atletas que participan en actividades deportivas bajo la jurisdicción del Comité Olímpico Puertorriqueño."

Resolución Núm. 10—"Felicita al American Bar Association, al Lcdo. Luis F. Camacho, al Lcdo. Arturo Negrón García, al Lcdo. Jorge Segarra Olivero, a la Lcda. María Inés Cartagena, a los abogados y empleados de Pro Bono por su colaboración en el éxito del proyecto que obtuvo el galardón 'Harrison Tweed Award' durante la convención del American Bar Association, celebrada en Chicago."

46. Este *exhibit* consiste de una lista de las resoluciones tomadas por la Junta de Gobierno durante la presidencia del Lcdo. Luis F. Camacho (1980–1982).

47. Este *exhibit* contiene una relación de las resoluciones tomadas por la Junta de Gobierno durante la presidencia del Lcdo. Ángel L. Tapia Flores (1978–1980).

48. Este *exhibit* enumera y describe las resoluciones tomadas por la Junta de Gobierno durante la presidencia del Lcdo. Arturo Negrón García (1982–1984).

49. Este *exhibit* contiene una relación de los gastos incurridos desde 1977 hasta 1984 en las asambleas generales del Colegio; una relación de los gastos incurridos por concepto de pago de primas de seguro de vida de los colegiados desde 1981 hasta 1984, y contiene además el total de egresos anuales de la institución desde 1977 hasta 1984. La información económica antes mencionada es la siguiente:

| Año | Gastos Asamblea | Gastos Seguro Vida | Egresos Anuales** |
|-----|-----------------|--------------------|--------------------|
| 1977 | 9,067.00 | * | 462,023.00 |
| 1978 | 31,097.00 | * | 547,574.00 |
| 1979 | 19,197.00 | * | 561,715.00 |
| 1980 | 23,087.00 | * | 781,071.00 |
| 1981 | 30,542.00 | 417,576.00 | 1,204,908.00 |
| 1982 | 33,287.00 | 472,403.00 | 1,496,995.00 |
| 1983 | 29,428.00 | 484,549.00 | 1,415,980.00 |
| 1984 | 55,453.00*** | 464,016.46 | 1,248,895.69 |

*Durante estos años el seguro de vida no se contabilizaba como un gasto, sino que se reflejaba como un cargo contra el fondo de seguro. Este fondo comprendía el 55% de ingreso de cuotas y el 80% de ingreso por concepto de venta de sellos forenses.
**Para el 1981 se comenzó a reconocer el pago de seguro de vida de los colegiados como un gasto y esto hizo que los egresos anuales aumentaran sustancialmente.
***Sin Auditar.

50. Este *exhibit* contiene una serie de documentos relacionados con la deuda de la Fundación con el Colegio de Abogados.

51. Este *exhibit* contiene copia de cuatro proyectos de ley que constituyeron parte del programa legislativo del Colegio, a saber:

(A) P. de la C. 233 que autoriza a la Junta de Gobierno a designar la fecha en que tendrán lugar las Asambleas anuales en el Colegio y las elecciones de los delegados por Distrito.

(B) P. de la C. 232 que confiere al Colegio de Abogados y a su Comité de Ética facultades adicionales para investigar las quejas que se formulan respecto a la conducta de los miembros de la institución en el ejercicio de su profesión.

(C) P. de la C. 231 que autoriza un aumento de la fianza notarial que deberán prestar los notarios para garantizar el fiel cumplimiento de sus obligaciones de $2,500 a no menos de $20,000.

(D) P. de la C. 230 para crear la Fundación de Investigaciones Jurídicas y Humanísticas del Colegio de Abogados y otros propósitos.

52. Este *exhibit* contiene una relación de los gastos ($148,545.11) en que ha incurrido el Colegio hasta el 15 de enero de 1985, como consecuencia de los procedimientos habidos en este caso.

53. Este *exhibit* contiene una relación de los costos de los trabajos realizados en la imprenta del Colegio relacionados con la publicación de las opiniones del Tribunal Supremo de Puerto Rico durante 1984 ($85,316.79). Esto representa un costo aproximado de $22.45 anual por el servicio a cada colegiado.

54. Este *exhibit* contiene el Reglamento de la Junta Revisora de las Actividades del Colegio de Abogados de Puerto Rico, según enmendado.

55. Este *exhibit* contiene una relación de los gastos incurridos por el Colegio entre 1977 y 1984, en la publicación de la Revista del Colegio, en la publicación de la Revista "Toga" o "Factum" y el costo de las comparecencias que por resolución de la Junta de Gobierno hizo el Presidente a las Naciones Unidas. El contenido del *exhibit* puede resumirse en la siguiente forma:

| Año | Rev. Colegio | Toga o Factum | O.N.U. | Total Anual |
|---|---|---|---|---|
| 1977 | 35,103.00 | 789.00 | 0.00 | 35,892.00 |
| 1978 | 31,030.00 | 7,643.20 | 769.89 | 39,443.09 |
| 1979 | 47,258.00 | 3,780.00 | 1,421.00 | 52,459.00 |
| 1980 | 59,021.00 | 11,786.00 | 2,049.29 | 72,856.29 |
| 1981 | 54,962.00 | 8,065.11 | 3,081.70 | 66,108.81 |
| 1982 | 55,695.00 | 19,579.69 | 3,148.53 | 78,423.22 |
| 1983 | 30,569.00 | 8,676.66 | 0.00 | 39,245.66 |
| 1984 | 0.00 | 3,732.17 | 934.06 | 4,666.23 |

Los Jueces Asociados Señores Negrón García, Rebollo López y la Juez Asociada Señora Naveira de Rodón se inhibieron.